## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Condair Group AG,                                    Case No. 21-cv-863 (PJS/ECW)

               Plaintiff,

v.                                                           **ORDER**
                                                     **(UNDER TEMPORARY SEAL)**
Dri-Steem Corporation,

               Defendant.

---

       This matter comes before the Court on Defendant Dri-Steem Corporation's

Motion for Leave to Amend Invalidity Contentions ("Motion to Amend") (Dkt. 70);

Plaintiff's Motion for Rule 37(c) Sanctions ("Motion for Sanctions") (Dkt. 105); and the

parties' Joint Motions Regarding Continued Sealing ("Joint Sealing Motions") (Dkts. 89,

126, 127).  For the reasons stated below, Defendant's Motion to Amend is denied,

Plaintiff's Motion for Sanctions is denied, and the Joint Motions Regarding Continued

Sealing are granted.

## I.    GENERAL BACKGROUND

### A.    Relevant Factual and Procedural Background

       Plaintiff Condair Group AG ("Condair" or "Plaintiff") filed this patent

infringement action against Defendant Dri-Steem Corporation ("Dri-Steem" or

"Defendant") on March 29, 2021, asserting that Defendant's GTS-LX Series Humidifiers

infringe claim 17 of United States Patent No. 10,634,372 ("Claim 17" of the "'372

Patent") issued by the United States Patent and Trademark Office on April 28, 2020.

(*See* Dkt. 1.)[1]  Claim 17 recites:

> A humidifier comprising:
>
> [a] a burner for burning a fuel within a water tank for generating steam in response to a demand;
>
> [b] a primary heat exchanger within the water tank for transferring heat from products of combustion of the fuel to the water within the water tank;
>
> [c] a secondary heat exchanger comprising a combusted gas section coupled to primary heat exchanger for receiving the cooled products of combustion from the primary heat exchanger and a water section for transferring additional heat from the cooled products of combustion to water flowing within the secondary heat exchanger; and
>
> [d] a secondary fill valve connected to the secondary heat exchanger which is pulsed to provide cool water for transferring additional heat from the cooled products of combustion to water flowing within the secondary heat exchanger; wherein
>
> [e] the water from a primary fill valve is fed directly into the water tank; and
>
> [f] an outlet of the secondary heat exchanger is fed directly into the water tank.

(*Id.* ¶ 15.)

The parties filed their joint Rule 26(f) Report on August 11, 2021, and on August 18, 2021, the Court entered a Scheduling Order.  (Dkts. 22, 26.)  The Scheduling Order set the deadline for the parties to complete fact discovery as April 22, 2022 and the deadline for Defendant to serve its invalidity chart[2] as October 18, 2021.  (Dkt. 26 at 2, 5

---

[1]    All page number citations are to the CM/ECF pagination unless otherwise noted.

[2]    The word "invalidity chart" is used interchangeably with "invalidity contentions" throughout this Order.

¶ (4)(a).)  Defendant's invalidity chart was to "list all of the prior art on which it relies . .

."  (*Id.* ¶ (4)(b).)

> The Scheduling Order also provided that:
>
> Defendant's Invalidity Chart may only be amended for good cause.  By way of example, absent undue prejudice to the non-moving party, good cause could include Defendant's discovery of material prior art, assuming Defendant was diligent in its search.  Amendments to the chart may only address the new information, and leave of Court must be sought no later than **30 days** after the new information is made available.

(*Id.* ¶ 4(c).)  Expert discovery, including depositions, was to be completed by July 1,

2022, with a trial ready date set as January 9, 2023.  (*Id.* at 9, 18.)

On April 22, 2022, the parties filed a joint motion to extend certain deadlines in

the Scheduling Order, including a proposed new fact discovery deadline of May 20,

2022.  (Dkt. 62 at 1-2.)  The Court granted that motion on April 26, 2022, extending the

deadline for the parties to complete fact discovery to May 20, 2022.  (Dkt. 64.)

On May 16, 2022, the parties sought another modification to the Scheduling

Order, noting that they had been engaged in settlement discussions in April and May

2022 and intended to continue with their settlement efforts.  (Dkt. 67 at 1.)  As a result,

the parties asked for an extension of certain deadlines, including the deadline for initial

expert reports to be extended to July 21, 2022, for rebuttal expert reports to be extended

to August 25, 2022, for expert discovery to close on September 23, 2022, and for the trial

ready date to be extended to April 3, 2023, but asked the Court to leave the deadline for

the completion of fact discovery as May 20, 2022.  (*Id.* at 1-2.)  On May 17, 2022, the

Court extended the schedule as requested by the parties.  (Dkt. 69.)

## II.    MOTION TO AMEND

### A.    Background

Defendant filed its Motion to Amend on May 27, 2022, along with a supporting memorandum and exhibits.  (Dkts. 70, 72-76.)  Plaintiff filed an opposition to the Motion, as well as supporting exhibits on June 7, 2022.  (Dkts. 82-84, 90.)  As further detailed below, the Court held a hearing on the Motion to Amend on July 12, 2022. (Dkts. 92, 95.)  At the hearing, Plaintiff represented that it was going to produce additional discovery materials to Defendant, and Defendant thought the production might affect the Motion to Amend.  (Dkt. 95 at 45:4-47:24, 48:18-50:5.)[3]  As a result, the Court permitted the parties to file supplemental briefs, as needed, after Plaintiff's additional discovery materials were produced to Defendant.  (*Id.*)  Defendant filed its supplemental brief and exhibits on August 5, 2022 (Dkts. 99-104) and Plaintiff filed its supplemental opposition brief and supporting exhibits on August 12, 2022 (Dkts. 114-117).

### 1.    Defendant's Arguments

Defendant claims good cause exists for it to amend its invalidity contentions because Plaintiff failed to disclose information regarding an early prototype of its invention that it installed at a third-party location in Ottawa, Canada in March 2015 (referred to as the "March 2015 Prototype" or "March 2015 P155 Field Test"), more than a year prior to the earliest priority date (June 13, 2016) of the '372 Patent ("the June 2015

---

[3]    Citations to transcripts are given in a transcript page:line number format.

critical date").[4]  (Dkt. 73 at 5, 10-12, 14-16.)  Defendant also claims the March 2015
Prototype qualifies as prior art under 35 U.S.C. § 102 because it was in "public use" and
"on sale" before the June 2015 critical date.  (*Id.* at 10-14.)  Defendant asserts in its initial
brief that the March 2015 Prototype was responsive to specific interrogatories,
particularly Interrogatory No. 4, which seeks information about prior art, and
Interrogatory No. 15, which seeks information about humidifiers having a secondary heat
exchanger that were installed between July 1, 2014 and June 13, 2017.  (*Id.* at 5, 11.)
Defendant claims Plaintiff responded to those interrogatories by stating "it knew of no
prior art other than what had been submitted to various patent offices" and that Plaintiff's
response to Interrogatory No. 15 did not provide any references to any prototypes.  (*Id.* at
5-6.)  Defendant maintains that Plaintiff's failure to disclose the March 2015 Prototype in
its interrogatory responses was without justification, as there is no evidence that the
March 2015 Prototype was confidential, and Plaintiff's Rule 30(b)(6) designee testified
that the March 2015 Prototype was likely sold to a third party.  (*Id.* at 5-6, 10-11.)
Defendant also maintains that while the March 2015 Prototype did not embody Claim 17,
it is important to invalidity as it had key features relevant to that claim, namely, it had the
claim limitations of a secondary heat exchanger and a pulsed valve.  (*Id.* at 10, 14-18.)
According to Defendant, this means the March 2015 Prototype is not cumulative of other
prior art.  (*Id.* at 17-18.)

---

[4]    The '372 Patent's earliest priority claim is to a provisional patent filed on June 13,
2016.  (Dkt. 1-1, Def.' at 2.)  At one point, Defendant states "[t]he provisional
application to which the '372 patent claims priority was filed in June 2015" (Dkt. 73 at
9), but this appears to be a typographical error.

Defendant contends that it learned of the March 2015 Prototype during the deposition of Plaintiff's witness, Scott Couperthwaite, on April 28, 2022.  (*Id.* at 11.)  Couperthwaite testified that the March 2015 Prototype had been installed at a third-party site, he had never seen a confidentiality agreement for that installation, and he did not know whether Plaintiff had been compensated for it.  (*Id.* at 11-12.)  At Defendant's deposition of Couperthwaite as Plaintiff's Rule 30(b)(6) designee on May 18, 2022, he testified that Plaintiff had searched for a confidentiality agreement relating to the installation of the March 2015 Prototype after his April 28 deposition but was unable to find one and that it was "likely" Plaintiff received compensation for the March 2015 Prototype installation.  (*Id.* at 12.)

Defendant argues that it was timely and diligent in seeking an amendment of its invalidity contentions pursuant to the Scheduling Order because it filed its Motion to Amend within 30 days of discovering the March 2015 Prototype and contends that the exceptions in Section 102(b)(1), including the "experimental use" exception, do not apply given that the March 2015 Prototype had been reduced to practice.  (*Id.* at 13-16.)

Defendant argues that it could not have discovered the March 2015 Prototype prior to the April and May depositions of Couperthwaite given Plaintiff's lack of response to relevant interrogatories and because it was unaware that it contained a secondary heat exchanger and was tested at a third-party site.  (*Id.* at 18-20.)  Defendant maintains that a spreadsheet referring to the March 2015 Prototype produced by Plaintiff early in discovery ("Prototype Testing Spreadsheet") did not provide any information indicating that it was prior art, and noting that the Spreadsheet "includes a single line item

6

describing the testing done on the Prototype." (*Id.* at 18.) Defendant argues that amending its invalidity contentions would not create undue prejudice to Plaintiff given that: (1) the timing is a problem of Plaintiff's own making; (2) information about the March 2015 Prototype and any agreements with third parties about it are within Plaintiff's possession; and (3) there is plenty of time to discover additional facts. (*Id.* at 20-22.) In Defendant's view, any alleged prejudice to Plaintiff is outweighed by the prejudice to it should the Motion to Amend be denied. (*Id.* at 20-22.) Defendant contends that its Motion to Amend is not motivated by gamesmanship. (*Id.* at 22.)

### 2. Plaintiff's Arguments

Plaintiff responds that Defendant had been on notice of two potential grounds for invalidating Claim 17 based on Plaintiff's activities since the early stages of this case: (1) a January 2015 public showing of Plaintiff's condensing humidifier at a trade show ("January 2015 Trade Show Unit"); and (2) the March 2015 Prototype. (Dkt. 82 at 5, 8.) Plaintiff argues that Defendant strategically chose to pursue only the January 2015 Trade Show Unit and included only that Unit in its invalidity contentions, as well as issued written discovery tailored to that Unit. (*Id.* at 5, 8-9.) Plaintiff contends Defendant could have taken a similar approach with the March 2015 Prototype but failed to do so until it realized "that was a bad choice" and that Defendant "is [now] scrambling to belatedly add the second ground and attempt to *ex post facto* find a way to recover from what in hindsight appears to have been the incorrect decision." (*Id.* at 8-9.)

Plaintiff argues good cause does not exist for Defendant to amend its invalidity contentions because "Dri-Steem had all the information it needed to raise the March 2015

P155 Field Test in its Invalidity Contention[s] in October 2021," and moreover, Defendant was not diligent in seeking additional information about the March 2015 Prototype. (*Id.* at 9.) As background, Plaintiff's project name for "its development of a high-efficiency dual-stage condensing humidifier" was "'P155,'" also known as a "'GS' humidifier." (*Id.* at 11.) Plaintiff contends (and it does not appear to be disputed) that Dri-Steem knew that "P155" referred to Plaintiff's development of the humidifier embodying Claim 17 because Dri-Steem used "P155" as a search term in its email requests.[5] (*Id.* at 11 & n.3.)

According to Plaintiff, the Prototype Testing Spreadsheet, titled "Test Plan for P155, Next Generation Gas Humidifier," was produced as part of a September 27, 2021 production ("September 2021 Production") and shows the model of the March 2015 Prototype as "GS150-HE" where a "Field Test" of it had been performed for 650 hours as of June 2015 at a third-party site in Ottawa ("Test Plan Document"). (*Id.* at 10-14.) The Prototype Testing Spreadsheet is shown below, where "Item" 10, with a "Model" of "GS150-HE," shows the March 2015 Prototype as a "Field Test - Ottawa." (Dkt. 82 at 13.)

---

[5]    Plaintiff argues that the emails produced as a result of Defendant's January 25, 2022 request included more information about the March 2015 Prototype, further demonstrating Defendant's lack of diligence. (Dkt. 82 at 33-34.)

Test Plan for P155, Next Generation Gas Humidifier

EXHIBIT 158

CouperthwaiteS 4/28/22

Huseby.com

| Item | Model | Location | Start Date | Finish Date | Version | Status | Tests | Hours Collected June 2015 | Expected hours by Dec 2015 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | GS150-ME/HE | OT Lab | Jul-14 | Jan. 2015 | Alpha unit | de-commissioned | Well water, performance, cycle test, life testing | 1000 | 1000 |
| 2 | GS150-ME/HE/NX | OT Lab | Jul-14 | Dec-15 | Alpha unit | tests in progress | Run on well water; no BD; Cycling | 2500 | 6000 |
| 3 | GS50-ME/HE/HE/NX | OT Lab | Jul-14 | Jan-15 | Alpha unit | de-commissioned | Performance, efficiency,Life testing. | 775 | 775 |
| 4 | GS100-HE | OT Lab | Jul-14 | Dec-14 | Alpha unit | de-commissioned | Performance, efficiency,Life testing. | 1200 | 1200 |
| 5 | GS50-HE | OT Lab | Jan-15 | Dec-15 | Beta unit | tests in progress | CSA validation, performance, efficiency,Life testing. | 800 | 4000 |
| 6 | GS100-HE | OT Lab | Jan-15 | Dec-15 | Beta unit | tests in progress | CSA validation, performance, efficiency,Life testing. | 350 | 4000 |
| 7 | GS300-HE | OT Lab | Jan-15 | Dec-15 | Beta unit | tests in progress | CSA validation, performance, efficiency,Life testing. | 750 | 3000 |
| 8 | GS450-ME | OT Lab | Aug-15 | | Zero series | start in Aug | CE certification unit, performance tests, | 0 | 200 |
| 9 | GS600-HE | OT Lab | Aug-15 | Dec-15 | Zero series | start in Aug | CSA validation, performance, efficiency | 0 | 1500 |
| 10 | GS150-HE | Field Test - Ottawa | Mar-15 | Dec-15 | Beta unit | off, re-start in Sept | commissioned by Nortec 3/9/2015 | 650 | 1850 |
| 11 | GS-E23HE | Field Test - Germany | NA | | Beta unit | waiting for site | CE certification unit. | 20 | 400 |
| 12 | GS-E65HE | Condair UK Lab | Jul-15 | Dec-15 | Beta unit | start in July | CE & EMC certification, to be installed & running in July | 20 | 3000 |
| 13 | GS-E90HE | Condair NL Lab | Jul-15 | Dec-15 | Beta unit | start in July | CE certification, to be installed & running in July | 20 | 3000 |
| 14 | GS-300HE | Field Test - California | Sep-15 | Dec-15 | Beta unit | start in Sept | waiting to be commissioned July/Aug 2015 | 0 | 1000 |
| 15 | GS-200ME | Field Test - Pennsylvania | Sep-15 | Dec-15 | Beta unit | off, re-start in Sept | commissioned by Nortec 6/24/2015 | 0 | 1000 |
| 16 | GS-200HE | Field Test - Pennsylvania | Sep-15 | Dec-15 | Beta unit | off, re-start in Sept | commissioned by Nortec 6/24/2015 | 0 | 1000 |
| 17 | GS-100HE | Field Test - Chicago | Sep-15 | Dec-15 | Beta unit | off, re-start in Sept | commissioned by Nortec 5/13/2015 | 0 | 1200 |
| 18 | GS-50HE | Field Test - Toronto | Sep-15 | Dec-15 | Beta unit | start in Sept | waiting to be commissioned July/Aug 2015 | 0 | 2000 |
| 19 | GS-50ME | Field Test - Toronto | Sep-15 | Dec-15 | Beta unit | start in Sept | waiting to be commissioned July/Aug 2015 | 0 | 600 |
| 20 | GS-50HE | Field Test - Pennsylvania | Sep-15 | Dec-15 | Beta unit | start in Sept | waiting to be commissioned July/Aug 2015 | 0 | 1200 |
| | | | | | | | Total hours | 8885 | 37925 |

Plaintiff states that the "Location" column in the Prototype Testing Spreadsheet is divided into "Lab" and "Field Test," where "Lab" denotes that the tests were performed in "Condair's labs" and "Field Test" denotes the tests were performed at third-party sites. (*Id.* at 19.) Plaintiff identified another document produced with the September 2021 Production, captioned "Field Test Unit Schedule," as putting Defendant on notice of the March 2015 Prototype. (*Id.* at 20; *see* Dkt. 83-4, Pl.'s Ex. 4 at 2.) The Field Test Unit Schedule is reproduced below.

**Field Test Unit Schedule**

EXHIBIT 156
Couperthwaite® 4/28/22
Huseby.com

| Unit Size | Designation | Notes | Assy hours | Weld hours | Required Date |
|---|---|---|---|---|---|
| GS-50ME | ASHRAE / field test unknown location | Need to ship Jan 9 | | 5.00 | 7-Jan-15 |
| GS-50HE | ASHRAE / field test unknown location | Need to ship Jan 9 | | 7.25 | 7-Jan-15 |
| GS-100HE | CSA Test Unit / Field test unknown location | Need to be ready for CSA on Jan 12 | | 7.25 | 8-Jan-15 |
| GS-150HE | CSA Test Unit / Ottawa (360 Laurier) | Need to be ready for CSA on Jan 12, Needs to ship week of Jan 19-24 | | 8.50 | 8-Jan-15 |
| GS-300HE | CSA Test Unit/ California Field test | Need to be ready for CSA on Jan 12 | | 13.75 | 8-Jan-15 |
| GS-300HE | Nortec lab unit / Flextronics | Use 300lb Alpha tank/HEs, Needs to be at Flextronics on Jan 16 | | 11.75 | 14-Jan-15 |
| GS-E90HE | BSI / NL field test | Need to ship Jan 23 | | 8.75 | 21-Jan-15 |
| GS-E23HE | BSI / UK (JS) field test | Need to ship Jan 23 | | 9.25 | 21-Jan-15 |
| GS-E65HE | BSI / DE field test | Need to ship Jan 23 | | 11.50 | 21-Jan-15 |
| GS-50HE | Kilmer | | | 7.25 | |
| GS-200ME | R.Zuritzky | | | 6.75 | |
| GS-200HE | R.Zuritzky | | | 19.75 | |
| GS-100HE | field test - unknown location | | | 10.25 | |
| GS-150ME | field test - unknown location | | | 8.00 | |
| GS-50HE | Nortec lab unit | Convert existing unit with new tank, frame & cabinet | | 6.00 | |
| GS-100HE | Nortec lab unit | Convert existing unit with new frame & cabinet | | - | |
| GS-150ME | Nortec lab unit | Convert existing unit to new tank, frame & cabinet | | 8.00 | |
| GS-150HE | Nortec lab unit | Keep as-is | | - | |
| GS-600HE | Nortec lab unit | | | - | |

According to Plaintiff, the Field Test Unit Schedule showed the GS-150HE designated as "Ottawa (360 Laurier)" needed to ship the week of January 19-24. (Dkt. 82 at 20-21(citing Dkt. 83-4, Pl.'s Ex. 4 at 2).) Plaintiff also claims that Defendant was aware of the features of the March 2015 Prototype, including that it had a secondary heat exchanger and primary fill valve, through other documents that were part of the September 2021 Production, and that Defendant "purchased, inspected, tested, and reverse engineered a P155/GS humidifier," which would have come with a spare parts

list, in 2016 prior to the Complaint being filed and the '372 Patent being issued.  (*Id.* at 14-18.)

In sum, Plaintiff contends that its September 2021 Production put Defendant on notice about the March 2015 Prototype three weeks before Defendant's invalidity contentions were due on October 18, 2021, nine months before discovery ended, and nine months before Defendant filed the Motion to Amend; that Defendant had sufficient details regarding the March 2015 Prototype to determine whether it was relevant to its invalidity defense before serving its invalidity chart; and that Defendant could have included the March 2015 Prototype in its invalidity contentions based "on information and belief" as to its components, as Defendant did when including the January 2015 Trade Show Unit in its invalidity contentions.  (*Id.* at 4-5, 9-12.)

Plaintiff states it produced other documents evidencing the March 2015 Prototype to Defendant in the September 2021 Production, which "Dri-Steem studied and then used [] to question Condair's witnesses about the March 2015 P155 Field Test during their April 27 and 28, 2022 depositions, belying Dri-Steem's assertion that it first learned of the March 2015 P155 Field Test during these depositions."  (*Id.* at 4 (citing Dkt. 83-2 to 83-7, 83-15 to 83-18, and 83-27).)

As to its responses to Interrogatory Nos. 4 and 15, Plaintiff argues Defendant did not raise any issues regarding those responses until May 12, 2022, eight months after Plaintiff answered Interrogatory No. 4 and two months after it answered Interrogatory No. 15.  (*Id.* at 6-7, 29-33, 35-37.)  Plaintiff also contends that Defendant did not serve its first deposition notice until April 14, 2022, even though the inventor of the '372 Patent

was identified "in the complaint and on the face of the patent included with the complaint filed on March 29, 2021," as well as on Plaintiff's initial disclosures provided on August 17, 2021. (*Id.* at 26, 34-35.)

Plaintiff also makes a gamesmanship argument. (*Id.* at 22-25.) According to Plaintiff, the parties jointly sought to modify certain deadlines in the Scheduling Order based on Defendant's suggestion that the parties engage in settlement discussion, Plaintiff provided Defendant with a settlement offer, but Defendant never responded but instead filed the current Motion even though the parties had agreed that "there would be '[n]o motions or discovery between May 21 and June 17, 2022'" so that they could engage in settlement discussions. (*Id.* at 22-25.)

As to Defendant's experimental use arguments, Plaintiff maintains that experimental use as it relates to the March 2015 Prototype is irrelevant for the purposes of the Motion to Amend. (*Id.* at 25-26.) Finally, Plaintiff argues that granting the Motion to Amend would prejudice Plaintiff by forcing it to incur over $100,000 in attorney's fees. (*Id.* at 26-28.)

### 3.    July 12, 2022 Hearing

As previously stated, the Court held a hearing on the Motion to Amend on July 12, 2022. (Dkts. 92, 95.) At the hearing, Defendant reiterated the arguments from its brief and also argued that because the March 2015 Prototype was installed at a third-party site, the only way Defendant could have known about it was through Plaintiff. (Dkt. 95 at 5:2-21:17; 39:1-41:24.) Defendant stated that it still had yet to receive documents showing what the March 2015 Prototype looked like, including its features. (*Id.* at 6:12-

23.)  Defendant also identified Interrogatory No. 1, which sought information regarding "conception and reduction to practice," and Interrogatory No. 3, which sought information about "efforts to commercialize the patent, including sales of humidifiers that embody any claim of asserted patent," as interrogatories to which Plaintiff should have identified the March 2015 Prototype, and but none of Plaintiff's sales spreadsheets showed any sales of the March 2015 Prototype.  (*Id.* at 11:1-15.)

Defendant also contended that there was no way for it to determine the March 2015 Prototype was prior art based on the September 2021 Production and because "normally there's not a payment made for the very first field test prototype."  (*Id.* at 13:6-14:5.)  In contrast, Defendant knew that the January 2015 Trade Show Unit was publicly disclosed because it was displayed at a trade show that Defendant's representatives attended and observed.  (*Id.* at 42:5-18.)  Defendant also explained that it did not take any depositions until April 2022 because the parties were engaged in email discovery in January and February 2022, so it waited until most of the email documents were produced.  (*Id.* at 7:19-8:6.)  Finally, Defendant argued that even if it had taken depositions earlier, it still would not have obtained pertinent information regarding the March 2015 Prototype as it was not until it deposed Plaintiff's Rule 30(b)(6) designee that it obtained such information.  (*Id.* at 9:23-10:20.)

In addition, Plaintiff reiterated the arguments in its opposition brief, namely that that Defendant's Motion to Amend is untimely due to its September 2021 Production which contained spreadsheets containing information about the March 2015 Prototype, and that regardless, Defendant failed to act diligently after receiving the September 2021

Production.  (*Id.* at 22:14-38:24.)  Plaintiff maintained that the spreadsheet in the

September 2021 Production showed various details, including the date, features, and

location of the March 2015 Prototype.  (*Id.* at 24:20-27:14.)  Plaintiff again argued that

the issue as to whether the March 2015 Prototype was in public use or on sale goes to the

experimental use exception, which does not have to be proven at the pleading stage.  (*Id.*

at 27:15-28:5; 29:8-30:18.)  Plaintiff further argued that regardless, Defendant knew the

March 2015 Prototype was in public use because Defendant knew it was field tested.

(*Id.*)

Also during the hearing, Defendant said that Plaintiff stated during their meet-and-

confer that there were documents still to be produced about the March 2015 Prototype

that should have been produced in June 2022.  (*Id.* at 9:7-14.)  In response, Plaintiff's

counsel stated that there had been a "technical" issue that prevented it from producing

those documents in June as planned, but Plaintiff expected to produce the documents "in

the next couple of days."  (*Id.* at 30:19-31:15.)  Based on the Plaintiff's representation

that it intended to produce additional documents about the March 2015 Prototype and

Defendant's position that those documents might affect the Motion to Amend, the Court

allowed the parties the opportunity to file supplemental briefs and extended the deadline

for filing nondispositive motions relating to fact discovery with respect to the documents

to be produced and the discovery requests at issue.  (*Id.* at 45:4-47:24, 48:18-50:5.)

### 4.    The Parties' Supplemental Arguments

Defendant filed its supplemental brief in support of the Motion to Amend on

August 5, 2022, wherein it states that Plaintiff produced over 18,000 documents on July

15, 2022 ("July 2022 Production"). (Dkt. 99 at 4.) Defendant claims several of those documents are pertinent to its Motion as they show that the March 2015 Prototype was sold prior to the June 2015 critical date. (*Id.* at 4-10.) By way of example, Defendant references three documents, one of which showed a quote of $6,460 (Canadian) for the March 2015 Prototype and another document showing it was sold to a third party, Dream Unlimited, for that amount, as well as a third document showing a packing slip for the sale. (*Id.* at 4-10.) Defendant claims that Plaintiff failed to produce those responsive documents at the time of its September 2021 Production. (*Id.*)

Defendant contends that an earlier production of those responsive documents would have prompted it "to seek further information" given that it "would have put [it] on notice of the sale of the Prototype as an invalidity defense." (*Id.* at 10-12, 18-21.) Defendant argues that its Motion to Amend should be granted because Plaintiff failed to indicate it was withholding documents in its earlier discovery responses, but the July 2022 Production shows Plaintiff was in possession of documents that were responsive to its discovery requests. (*Id.* at 12-15.)

Defendant maintains there was no way it would have known that the September 2021 Production "with a cryptic reference to '360 Laurier'" was an address of a third party, as opposed to that of Condair, given the lack of sufficient clues like "road, street, boulevard, or avenue," of the type found in the July 2022 Production, and that because Plaintiff has multiple facilities, references to the March 2015 Prototype needing to be shipped in the September 2021 Production was insufficient to put it on notice that it went

to a third party because "the Prototype could have been manufactured at one Condair location and shipped to another." (*Id.* at 19-20.)

Plaintiff filed its supplemental opposition brief on August 12, 2022. (Dkt. 114.) Plaintiff argues that Defendant has provided no sufficient reason for its failure to timely identify the March 2015 Prototype in its invalidity contentions as knowledge of a sale was unnecessary for it to allege invalidity, and that regardless, many of the documents from the July 2022 Production relied on by Defendant included factual content also contained in documents produced with the September 2021 Production. (*Id.* at 3-17.) Plaintiff contends that Defendant could have sought documents specific to field tests and sales quotes after it received the September 2021 Production or taken depositions earlier in the case, but failed to do so. (*Id.*)

## B.    Legal Standard

In this District, a motion to amend invalidity contentions is a nondispositive motion, as it is in effect a request to modify the scheduling order. *See Oxygenator Water Tech., Inc. v. Tennant Co.*, No. 20-cv-358 (ECT/HB), 2021 WL 6062539, at *2 (D. Minn. Dec. 22, 2021) (finding a motion for leave to amend invalidity contentions is in effect a request to modify the scheduling order) (citing Local Rule 7.1(b)(4)(A)(i) ("providing that 'nondispositive motions covered by this subsection include, for example: motions to amend pleadings' and 'discovery related motions'")) (cleaned up); *Elkharwily v. Mayo Holding Co.*, No. 12-cv-3062 (DSD/JJK), 2014 WL 3573674, at *1-2 (D. Minn. July 21, 2014) (reviewing denial of motion to modify scheduling order as nondispositive.).

"As a general matter, courts require a showing of 'good cause' before allowing late amendments to invalidity contentions." *Solutran, Inc. v. U.S. Bancorp*, Case No. 13-cv-2637 (SRN/BRT), 2016 WL 7377099, at \*3 (D. Minn. Dec. 20, 2016) (citations omitted). Courts in this district examine the following five factors in assessing good cause: "(1) whether the moving party showed diligence; (2) the relevance and importance of newly discovered prior art; (3) whether the request to amend is motivated by 'gamesmanship'; (4) the difficulty of locating the prior art; and (5) whether the opposing party will be prejudiced by the amendment." *Id.* (citing *Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*, No. 12-cv-2706 (MJD/LIB), 2014 WL 2945877 at \*5 (D. Minn. Apr. 28, 2014)). While all five factors are relevant in analyzing the existence of good cause, "the Federal Circuit has made clear that a showing of diligence is an absolute requirement." *Id.* (citing *O2 Micro Int'l Ltd. V. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006)).

The moving party has the burden of establishing diligence and must show: "(1) diligence in discover[ing] the basis for amendment; and (2) diligence in seeking amendment once the basis for amendment has been discovered." *Willis Elec. Co., Ltd. v. Polygroup Trading Ltd.*, Case No. 15-cv-3443-WMW-KMM, 2021 WL 568454, at \*12 (D. Minn. Feb. 16, 2021) (quoting *Solutran*, 2016 WL 7377099, at \*3). The Court's analysis may conclude if it determines Defendant has not demonstrated it acted diligently. *Solutran*, 2016 WL 7377099, at \*3 (citing *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001)) ("noting that the primary measure of Fed. R. Civ. P. 16(b)'s good cause standard is the moving party's diligence in attempting to meet the case

17

management order's requirements, and finding no need to go beyond the diligence inquiry where plaintiff had demonstrated only minimal efforts to satisfy the case management schedule") (quotations omitted); *see also ICON Health & Fitness, Inc. v. Octane Fitness, LLC*, Civ. No. 09-319 ADM/SRN, 2010 WL 1839321, *1 (D. Minn. May 5, 2010) ("[A] party's diligence in amending its infringement contentions is central to a finding of good cause.").

"To permit a moving party to amend the prior art statement requires that all such directives, as recited in the Pretrial Order, be satisfied." *FLOE Int'l, Inc. v. Newmans' Mfg. Inc.*, Civ. No. 04-5120 (DWF/RLE), 2005 WL 6218040, *2 (D. Minn. Nov. 9, 2005).

## C.   Analysis of Defendant's Motion to Amend

Defendant seeks to amend its invalidity contentions seven months after expiration of the deadline established by the Scheduling Order.  The Scheduling Order provides that:

> Defendant's Invalidity Chart may only be amended for good cause. By way of example, absent undue prejudice to the non-moving party, good cause could include Defendant's discovery of material prior art, assuming Defendant was diligent in its search. Amendments to the chart may only address the new information, and leave of Court must be sought no later than **30 days** after the new information is made available.

(Dkt. 26 at 5 ¶ 4(c)).  As previously stated, Defendant has the burden to show that it acted diligently in discovering the March 2015 Prototype and in bringing the Motion to Amend.

To recap the parties' arguments, Defendant argues that it has met its burden because it sought to amend shortly after learning about the March 2015 Prototype during

the depositions of Plaintiff's witness and Rule 30(b)(6) designee. (Dkt. 73 at 11-16.)

Defendant contends that the September 2021 Production did not put it on notice that the

March 2015 Prototype was in "public use" or on "sale," or that it contained a secondary

heat exchanger, which it asserts is further evidenced by the July 2022 Production, and

that the experimental use exception under Section 102(b)(1) does not apply because the

March 2015 Prototype had been reduced to practice. (Dkt. 73 at 5, 10, 13-20; Dkt. 99 at

3-12.) Defendant argues that it propounded interrogatories on Plaintiff earlier in the case

asking for the very documents Plaintiff ultimately produced in July 2022, and that

Plaintiff's untimely disclosure of these documents impeded it from including the March

2015 Prototype as prior art when it served its original invalidity contentions. (Dkt. 99 at

3-17.)

      Plaintiff counters that Defendant had sufficient information in the September 2021

Production to have timely asserted the March 2015 Prototype as prior art, at least "on

information and belief," as was done for the January 2015 Trade Show Unit, but chose

not to do so, and that regardless, Defendant failed to act diligently in its discovery efforts.

(Dkt. 82 at 4-5, 8-37; Dkt. 114 at 3-16.) Plaintiff contends that Defendant's diligence

should be assessed from the time it received the September 2021 Production and not from

the April and May 2022 depositions. (Dkt. 82 at 8-18.)

      It is unfortunate that Plaintiff did not produce certain documents relating to the

March 2015 Prototype until July 2022, although the Court notes that Plaintiff blamed this

on the fact that the documents were obtained from a third party and then not produced

when planned in June 2022 due to a technical issue. (Dkt. 95 at 30:19-31:9.)

Nevertheless, the September 2021 Production contained sufficient information about the March 2015 Prototype to warrant further investigation by Defendant at that time.

First and foremost, the Test Plan Document shows there were twenty units undergoing lab or field testing as of December 2015, where some testing had begun before the June 2015 critical date.  The Test Plan Document was produced in various forms in the September 2021 Production.  (*See* Dkt. 75-1, Def.'s Ex. 9 at 2; Dkt. 83-11, Pl.'s Ex. 11 at 2; Dkt. 83-12, Pl.'s Ex. 12 at 2; Dkt. 83-27, Pl.'s Ex. 27 at 9; Dkt. 83-28, Pl.'s Ex. 28 at 9; Dkt. 83-29, Pl.'s Ex. 29 at 8.)

The particular "Model" at issue is the "GS 150-HE," which has the following entries in the Test Plan Document: location: "Field Test – Ottawa"; start date: "Mar-15"; finish date: "Dec-15"; version: "Beta unit"; status: "off, re-start in Sept"; "tests" – "commissioned by Nortec 3/9/2015"; hours collected June 2015: "650"; and expected hours by Dec 2015: "1850."  (*See* Dkt. 75-1, Def.'s Ex. 9 at 2; *see also* Dkt. 83-11, Pl.'s Ex. 11 at 2.)  As discussed in Section II.A.2, the Field Test Unit Schedule (also produced with the September 2021 Production) shows the "Designation" of the "GS 150-HE" as "Ottawa (360 Laurier)" and states the following in a "Notes" column: "Jan 12, Needs to ship week of Jan 19-24."  (Dkt. 83-4, Pl.'s Ex. 4 at 2; Dkt. 83-8, Pl.'s Ex. 8 at 2.)

Defendant argues that the information contained in the September 2021 Production was insufficient to put it on "notice that the [March 2015] Prototype was prior art or that it had features relevant to invalidity (such as a secondary heat exchanger)." (Dkt. 73 at 20.)  But while Defendant did not have certainty as to whether the March 2015 Prototype was prior art or had a secondary heat exchanger, the Test Plan Document

and Field Test Unit Schedule certainly put Defendant on notice that it should investigate the March 2015 Prototype before serving invalidity contentions. To begin with, the location for the March 2015 Prototype is listed in the Test Plan Document as "Field Test – Ottawa." (*See* Dkt. 75-1, Def.'s Ex. 9 at 2.) The ordinary definition of "field test" is "to test (a procedure, a product, etc.) in actual situations reflecting intended use." *See Field-test*, Marriam-Webster Dictionary, https://www.merriam-webster.com/ dictionary/field%20test (last visited October 12, 2022). Defendant does not suggest it did not know what "field test" means; instead, Defendant argues that there was no way for it to have known that the field test was conducted at a third-party site rather than one of Plaintiff's locations in Ottawa. (Dkt. 73 at 18-19.) Even if that is true, Defendant certainly could have served discovery to ascertain where the field test occurred, particularly as that March 2015 Prototype testing is one of the few instances of field testing more than a year prior to the earliest priority date of the '372 Patent.

Moreover, the Field Test Unit Schedule shows the March 2015 Prototype as "[n]eeds to ship week of Jan 19-24" with a "Designation" stated as "Ottawa (360 Laurier)." (Dkt. 83-4, Pl.'s Ex. 4 at 2.) Defendant contends that because Plaintiff owns several facilities, there was no way this information would have notified it that an external shipment was to occur instead of a shipment from one of Plaintiff's facilities to another. (Dkt. 73 at 19; Dkt. 99 at 17.) This argument is undermined by the fact that Defendant does not appear to have tried to determine where the March 2015 Prototype was shipped, either through discovery or basic Internet research, any time before serving its invalidity contentions (nor, apparently, any time before filing the Motion to Amend).

21

While Defendant claims it was unaware the March 2015 Prototype contained a secondary heat exchanger, another document from the September 2021 Production entitled "Monthly Admin Mtg." for the "P155 MEETING 25/4/13" states "GS 100 is being built in lab with tank, heat exchanger, burner, secondary heat exchanger," and Defendant does not dispute Plaintiff's assertion that Defendant "purchased, inspected, tested, and reverse engineered a P155/GS humidifier" in 2016 that would have been delivered with a spare parts list.  (Dkt. 83-6, Pl.'s Ex. 6 at 1, 11; Dkt. 82 at 18.)

Instead of identifying any steps undertaken to investigate the March 2015 Prototype before its invalidity contentions were due, Defendant focuses on its argument that Plaintiff's responses to certain interrogatories were deficient.  (Dkt. 73 at 5.) Defendant's Interrogatory No. 1 sought information regarding "the conception, reduction to practice (actual or constructive), and all activities constituting diligence from conception to reduction to practice" for each claim of the Asserted Patent.  (Dkt. 74-3, Def.'s Ex. 3 at 6.)  Plaintiff's response to that interrogatory served on September 13, 2021 stated:

> Subject to its General and Specific Objections, Plaintiff states that it is informed and believes the invention recited in claim 17 of the Asserted Patent was conceived by Plaintiff and reduced to practice on or around March 17, 2017. The invention of the Asserted Patent was first publicly disclosed by Plaintiff on or around March 17, 2017. The first commercial embodiments of the claimed invention were Plaintiff's GS-series humidifiers that were re-worked to incorporate the limitations of claim 17 of the Asserted Patent, such re-working having occurred on or around March 17, 2017. The documents produced in response to Request for Production No. 14 will also be responsive to this interrogatory.

(*Id.* at 7, 22.)

At the hearing, in response to the Court's question regarding whether Plaintiff's response to that interrogatory described testing with prototypes and field testing, Plaintiff's counsel responded:

> A: In light of – I don't want to speculate, but our answer might have been limited to claim 17, in which case there wouldn't have been any field testing.

> Q: Because the unit in question is not an embodiment of claim 17?

> A: Correct.

(Dkt. 95 at 32:23-33:14; *see also* Dkt. 73 at 17 (Defendant's Brief in Support of the Motion stating "Although the Prototype did not embody the asserted claim 17, it had the most important element of claim 17 – a secondary heat exchanger.").)  Plaintiff also responded to Interrogatory No. 1 by stating that documents produced in response to Request for Production No. 14 would be responsive.  (Dkt. 74-3, Def's Ex. 3 at 7.)

Defendant's Interrogatory No. 4 sought "all Prior Art that may be relevant" to the Asserted Patent, including for Plaintiff to "state in detail the dates, facts, and circumstances under which Plaintiff became aware of such Prior Art."  (*Id.* at 9.) Plaintiff responded

> Subject to its General and Specific Objections, Plaintiff responds as follows: outside of the prior art cited by the U.S. and foreign patent offices and by the Defendant in its Counterclaims, Plaintiff is not aware of any relevant prior art. Furthermore, because Plaintiff's discovery and investigation is still ongoing, Plaintiff specifically reserves the right to timely supplement its response to this interrogatory pursuant to Fed. R. Civ. P. 26(e).

(*Id.* at 10.)

Lastly, Defendant's Interrogatory No. 15 (served on February 25, 2022, after invalidity contentions were due) asked Plaintiff to describe "in detail each installation of a Plaintiff humidifier having a secondary heat exchanger between July 1, 2014 and June 13, 2017," to which Plaintiff responded on March 26, 2022:

> Subject to its General and Specific Objections, Plaintiff responds as follows: Plaintiff's Responses to Dri-steem's Interrogatory Nos. 5 and 6 describe each model sold by either Nortec or Condair which includes a secondary heat exchanger. See also COND0005274-COND0006400 and COND0008134. Furthermore, because Plaintiff's discovery and investigation is still ongoing, Plaintiff specifically reserves the right to timely supplement its response to this interrogatory pursuant to Fed. R. Civ. P. 26(e).

(Dkt. 74-4, Def's Ex. 4 at 9; Dkt. 74-5, Def.'s Ex. 5 at 8-9.)

Plaintiff responds with a number of reasons why its interrogatory responses were not deficient, and by arguing that its objections were clear as to how it was responding to the interrogatories. (Dkt. 82 at 29-33.) Based on the record before the Court, Plaintiff does not appear to have intentionally withheld information about the March 2015 Prototype or otherwise attempted to mislead Defendant when responding to these interrogatories, and Defendant raised its concerns about the responses months after they were served, only after the April 2022 depositions. (Dkt. 81 at 29.) The Court concludes that any deficiencies in the interrogatory responses do not support a finding of diligence when Defendant had sufficient information based on the September 2021 Production that it should investigate the March 2015 Prototype. Indeed, at the hearing, Defendant noted that the Test Plan Document is "kind of cryptic, but it shows there's a start date in [March] of 2015. The priority date is like June of 2015. So it tells a little bit about when the prototype testing might have started, and that's [March] of 2015." (Dkt. 95 at 12:13-

24

13:5.)  A document indicating that a prototype was field tested before the priority date of

the '372 Patent does not appear overly cryptic to the Court, but in any event, to the extent

it was not clear, any unknowns about the circumstances of the field testing should have

been promptly investigated.

The Court is similarly unpersuaded by Defendant's emphasis on the fact that it did

not know whether the March 2015 Prototype was sold or subject to a confidentiality

agreement until the April 2022 depositions, and therefore did not know if it was in

"public use" such that it could constitute prior art.  (Dkt. 73 at 6, 12-13, 18; Dkt. 99 at 17-

18.)  This uncertainty only bolsters the notion that Defendant should have acted

proactively once it received the September 2021 Production referencing the March 2015

Prototype.  The Court recognizes that the September 2021 Production did not clearly

establish that the March 2015 Prototype was prior art, or that Defendant may have had a

public use argument based on the field testing of that Prototype.  But it put Defendant on

notice that it should begin investigating the March 2015 Prototype field testing, and

Defendant's failure to do so means Defendant cannot show the requisite diligence in

discovering the basis for the proposed amendment of its invalidity contentions to permit

the amendment.  *See Unverferth Mfg. Co., Inc. v. Meridian Mfg., Inc.*, No. 19-CV-4005-

LTS-KEM, 2021 WL 297132, at \*3 (W.D. Iowa Jan. 28, 2021) ("Although Meridian

asserts that it searched for 'several months' (more than two) before finally locating a

BT1500 to rent in August 2020, it does not explain why it did not begin looking for a

BT1500 machine earlier in time.  . . .If Meridian had begun searching for a BT1500

machine earlier in time, it could have located a machine prior to the July 2020 deadline

25

for final invalidity contentions."); *see also Evicam Int'l, Inc. v. Enf't Video, LLC*, Civ. No. 4:16-CV-00105, 2016 WL 6600605, at *2 (E.D. Tex. Nov. 8, 2016) (finding defendant's delay in contacting inventors weighed against permitting amendment of the invalidity contentions where defendant "suspected these inventors possessed information useful in proving the invalidity of the patents-in-suit"). Further, it is undisputed that the September 2021 Production contained 1,000 documents, many of which showed the location and some details regarding the Prototype. (*See* Dkt. 95 at 24:18-25:2.) This is not a large number of documents to review before serving invalidity contentions.

Finally, the Court addresses Defendant's argument that even if it had taken the depositions of Plaintiff's fact witnesses at an earlier time, it would still not have been aware that the March 2015 Prototype was on sale without any known confidentiality agreement until it took the deposition of Plaintiff's Rule 30(b)(6) designee "on May 18, two days before the close of fact discovery . . . which was intentionally scheduled towards the end of fact discovery (after the individual depositions)" and that regardless, "the timing of depositions is not a reason to deny the motion." (Dkt. 99 at 17.) Defendant cites *Regalo Int'l, LLC v. DEX Prods., Inc.*, No. 08-cv-4206 (ADM/AJB), 2009 WL 10687805, at *3 (D. Minn. Nov. 3, 2009) in arguing that the September 2021 Production did not contain information to indicate "whether the Prototype was on sale or subject to a confidentiality obligation" and that subsequent deposition testimony is a basis for leave to amend. (Dkt. 99 at 18-20; Dkt. 73 at 19.)

In *Regalo*, the defendant sought leave to supplement its prior art statement on the basis that it was unaware of a relevant prior art product, a "Whalen Y-strap bedrail," until

it learned during two depositions that the product was for sale in the United States and because it "fell outside of the scope of Defendant's intended narrow claim construction." 2009 WL 10687805, at *1-2. The defendant argued that the whereabouts of the two persons it eventually deposed "were unknown until late August 2009 and early October 2009." *Id.* The defendant's counsel sent the plaintiff's counsel a "hand-drawn diagram of Whalen's Y-strap bedrail [dated December 16, 2008] in support of its invalidity defense" on January 9, 2009 and then produced the diagram on February 10, 2009. *Id.* The deadline for the defendant to serve its list of prior art was March 13, 2009, and fact discovery closed on September 25, 2009, the same day the defendant sought to supplement its prior art. *Id.*

In granting the defendant's request, the *Regalo* court found that while it was clear the defendant had knowledge of the Whalen Y-strap bedrail in its diagramed form before the March 13, 2009 deadline, "having knowledge or possession of a hand-drawn diagram is different than having knowledge of relevant prior art" and that a "hand-drawn diagram without more does not warrant the conclusion that the diagramed item was an invention that 'was patented or described in a printed publication in this or a foreign country or in its **public use** or on sale in the country, more than one year prior to the date of the application for patent in the United States." *Id.* (emphasis added) (citing 35 U.S.C. § 102(b)). The *Regalo* court also noted that the relevance of a U.S. patent the defendant also sought to add to its invalidity contentions was not clear until the depositions revealed that a feature from that patent was used in making the Whalen Y-strap bedrail, which "transformed the hand-drawn diagram into an item that Defendant[] can allege is an

invention sold in the United States," and that the defendant presented sufficient facts showing it could not have contacted the deponents prior to September 2009. *Id.* at *2-3.

*Regalo* presents a very different set of circumstances than are found here. First, in *Regalo*, there was no evidence that the defendant was in possession of any information suggesting that the Whalen-Y strap bedrail was offered for sale before the priority date until the defendant deposed the two witnesses. Here, Plaintiff produced documents to Defendant as early as September 2021 indicating that the March 2015 Prototype may have been in public use before the priority date, including the Test Plan Document (in various forms) and the Field Unit Test Schedule. (*See* Dkt. 75-1, Def.'s Ex. 9 at 2; Dkt. 83-11, Pl.'s Ex. 11 at 2; Dkt. 83-12, Pl.'s Ex. 12 at 2; Dkt. 83-27, Pl.'s Ex. 27 at 9; Dkt. 83-28, Pl.'s Ex. 28 at 9; Dkt. 83-29, Pl.'s Ex. 29 at 8; Dkt. 83-4, Pl.'s Ex. 4 at 2; Dkt. 83-8, Pl.'s Ex. 8 at 2.) Second, in *Regalo*, the defendant "presented sufficient facts for this Court to conclude that Defendant could not have contacted [the two witnesses] prior to September 2009." *Id.* at *3. Defendant has made no such showing of inability to obtain the missing information here.

In sum, the information contained in the September 2021 Production was enough to make Defendant investigate where the March 2015 Prototype was installed. Moreover, Plaintiff represented, and Defendant does not dispute, that the September 2021 Production contained 1,000 documents, many of which showed the location and some details regarding the March 2015 Prototype. (*See* Dkt. 95 at 24:18-25:2.) Under these circumstances, the Court is not convinced that Defendant acted diligently in seeking information regarding field testing and the March 2015 Prototype upon receiving the

28

September 2021 Production.  Even if the Court concluded that Defendant acted diligently in moving to amend after the April and May 2022 depositions, that diligence cannot overcome the lack of diligence with respect to the March 2015 Prototype with respect to the time period between September 2021 and April 2022.

The Court's finding of no diligence ends the inquiry into whether it should grant leave to amend.  *See Solutran*, 2016 WL 7377099, at *3.  However, even if the Court considered the other four factors and assumes the March 2015 Prototype is important and not cumulative to other prior art as well as no gamesmanship on the part of Defendant, the Court would still deny the Motion to Amend.  *See id.* (listing factors).  This is because, first, it would not have been difficult for Defendant to determine whether the March 2015 Prototype qualified as prior art earlier at least by serving tailored written discovery.  Second, Plaintiff argues prejudice because: "[T[he question of experimental use is a highly fact specific issue that relies on a totality of the circumstance's standard.  Potentially many more depositions will need to be taken and third-party discovery pursued such as from, for example, witnesses at the test sites and former employees of Condair that have may have relevant knowledge."  (Dkt. 82 at 26-27.)  Defendant responds that the cost of additional discovery is not the type of prejudice a court considers on a motion for leave to amend invalidity contentions.  (Dkt. 95 at 41:19-24.)  However, fact discovery has closed in this matter, as has expert discovery.  (*See* Dkt. 69.)  Chief U.S. District Judge Patrick J. Schiltz held a *Markman* hearing on March 28, 2022 (Dkt. 56), before the April and May 2022 depositions relied on by Defendant, and has already issued a *Markman* order (Dkt. 125).  Summary judgment briefing begins on

October 14, 2022 (Dkt. 113). "The primary threat of prejudice to a plaintiff in a patent litigation to granting a defendant leave to amend its prior art statement is when claim construction has already occurred." *Regalo*, 2009 WL 10687805, at *3. Under these circumstances, consideration of the five factors also supports denying the Motion to Amend.

For all of these reasons, the Court denies the Motion to Amend.

### III.   MOTION FOR SANCTIONS

### A.   Background

On August 10, 2022, Plaintiff filed the Motion for Sanctions relating to a modified version of Defendant's accused products, the GTS-LX Series Humidifier (the "Modified GTS-LX Humidifiers"), and certain of Defendant's supplemental Rule 26(a)(1) disclosures and supplemental response to Interrogatory 13 (collectively, "July 19 Disclosures"). (Dkt. 105; Dkt. 106 at 2.) In particular, on July 18, 2022, Defendant produced a schematic diagram and description of the "principle of operation" of the Modified GTS-LX Humidifiers ("Principle of Operation Diagram"). (Dkt. 106 at 2.) The next day, on July 19, 2022, Defendant served a supplemental response to Interrogatory No. 13 stating that the Modified GTS-LX Humidifiers began shipping on June 15, 2022. (Dkt. 106 at 8.) On the same day, Defendant served supplemental Rule 26(a)(1) disclosures that Plaintiff claims "added new topics of testimony on critical subjects that [Defendant's] witnesses did not answer, or were instructed not to answer, during their depositions," including Defendant's "development efforts with respect to gas-to steam humidifiers in approximately 2006-2008, including consideration of a

30

secondary heat exchanger and micro-fill technologies" ("2006-2008 Development Work"), the sale and marketing of the accused products and the Modified GTS-LX Humidifiers, and "opinions of counsel pertaining to invalidity of the asserted patent rendered by Patrick Johnson." (*Id.* at 2, 13-14, 18-22.)

Plaintiff seeks the following relief: that (1) Defendant's experts should not be allowed to rely on the Modified GTS-LX Humidifiers or the Principle of Operation Diagram; (2) Defendant's witnesses, Jim Lundgreen and David Schwaller, should not be allowed to testify about the Modified GTS-LX Humidifiers or the alleged 2006-2008 Development Work that was first listed in the July 19 Disclosures; (3) no Dri-Steem witnesses should be allowed to testify about the Modified GTS-LX Humidifiers; and (4) Dri-Steem's President, David Pflum, should not be allowed to testify on subjects first identified in the July 19 Disclosures. (Dkt. 105 at 1-2.)

Defendant filed an opposition to the Motion for Sanctions on August 17, 2022. (Dkt. 120.) The Court heard argument on September 13, 2022. (Dkts. 128, 131.)

### 1.    Plaintiff's Arguments

Plaintiff argues that the Modified GTS-LX Humidifiers were first sold or offered for sale on June 15, 2022, but Defendant did not timely inform Plaintiff of that product's existence to allow Plaintiff and its expert to investigate or analyze it, thereby violating Federal Rule of Civil Procedure Rule 26(e)(1)(A). (Dkt. 106 at 3-5, 7-10.) Plaintiff contends that because fact discovery closed on May 20, 2022 and because Defendant produced the Principle of Operation Diagram and July 19 Disclosures (collectively, "July Supplementation") so close to the expert report deadline of July 21, 2022, there was no

31

way for Plaintiff's expert to utilize those documents in formulating his opinion in his infringement analysis. (*Id.* at 2-5, 7-12.) Plaintiff argues it is prejudiced by the timing of the July Supplementation because Defendant's expert used the Principle of Operation Diagram in making his obviousness-secondary consideration arguments in his expert report about the Modified GTS-LX Humidifiers. (*Id.* at 3.)

Defendant produced CAD drawings of the Modified GTS-LX Humidifiers on April 9, 2022[6]. (*See* Dkt. 121-1, Def.'s Ex. 1 at 2.) However, according to Plaintiff, the CAD drawings did not show water flow details as shown in the Principle of Operation Diagram (also referred to as a "cartoon drawing"); the CAD drawings were "useless[]," as evidenced by Defendant's expert's use of the cartoon drawing; later "review revealed that the CAD drawings show exploded perspective views of the [Modified GTS-LX Humidifiers], but none of the CAD drawings show the water flow details included" in the cartoon drawing; and Plaintiff was "either defending or taking at least two depositions every week in May leading up to the close of fact discovery, and thus had no reasonable opportunity to inspect or assess the CAD drawings." (Dkt. 106 at 8-12.) As a result, Plaintiff asks the Court to extend the Scheduling Order for its Motion to be considered, contends that additional time cannot cure the prejudice to it because its experts have already formed opinions that did not consider the Modified GTS-LX Humidifiers, and

---

[6]    It appears Plaintiff inadvertently stated in its brief that the CAD drawings were produced on May 9, 2022. (Dkt. 106 at 11 n.5, 12.) The record shows the CAD drawings were produced on April 9, 2022. (*See* Dkt. 121-1, Def.'s Ex. 1 at 2.)

requests that Defendant's experts should not be permitted to rely on materials relating to the Modified GTS-LX Humidifiers. (*Id.*)

Plaintiff also argues that Defendant's July 19 Disclosures greatly expanded the expected topics of testimony to be provided by Defendant's witnesses Jim Lundgreen and David Schwaller in a manner that directly conflicts with their deposition testimony. (Dkt. 106 at 12-14.) According to Plaintiff, because it was not notified of the additional topics in the July 19 Disclosures prior to the depositions of those witnesses, it was unable to properly question them on those matters at their depositions and its experts were unable to consider testimony they may have given. (*Id.*)

Plaintiff also claims that it attempted to obtain testimony from several of Defendant's other witnesses, including Jennifer Montville (Defendant's Director of Marketing), Michael Lanners (Defendant's Director of Sales), David Pflum (Defendant's President), and Mysty Hanson (Defendant's Rule 30(b)(6) designee on marketing and sales), regarding a "new design" that was first mentioned in an April 6, 2022 Rule 408 letter from Defendant ("April 6 Letter"). (*Id.* at 15-22.) Plaintiff argues that the witnesses "either claimed little or no knowledge regarding the 'new design' prototype[,]" and that Defendant's counsel directed Pflum not to provide answers in response to Plaintiff's counsel's questions regarding the testimony Pflum expected to give at trial, causing counsel not to ask questions regarding the Modified GTS-LX Humidifiers "and other topics absent from his Rule 26(a) disclosure." (*Id.* at 15-21.) Specifically, Plaintiff contends that although Lanners and Hanson were not previously listed in Defendant's prior disclosures, the July 19 Disclosures list them as having information regarding "[t]he

sales and marketing of the accused products and the modified [GTS-]LX humidifiers; the market and competition for the accused products and the modified [GTS-]LX humidifiers," and that although Defendant's prior disclosures listed Montville as having knowledge regarding the marketing and market and competition for the accused products, the July 19 Disclosures state she also has knowledge as to the sales and marketing of, and market and competition for, the Modified GTS-LX Humidifiers.  (*Id.* at 18.)  As to Pflum, Plaintiff claims Defendant's prior disclosure indicated he has knowledge regarding the "sales and profits of the accused products; Dri-Steem's business operations pertaining to the accused products[,]" but that the July 19 Disclosures reflects he has knowledge as to "[t]he sales and profits of the accused products and the modified [GTS-]LX  humidifiers; DriSteem's business operations pertaining to the accused products and the modified [GTS-]LX humidifiers; [and] the opinions of counsel pertaining to invalidity of the asserted patent rendered by Patrick Johnson."  (*Id.* at 21.)

Plaintiff's brief included the following table comparing Defendant's February 25, 2022 supplement to its Rule 26(a)(1) disclosures ("February 25 Supplement") with the July 19 Disclosures for Lundgreen and Schwaller, contending it was prevented from seeking discovery regarding the "new topics" that "are underlined and shown in red."

| Witness | Initial Disclosure | First Supplement February 25, 2022 | Second Supplement July 19, 2022 |
|---|---|---|---|
| Jim Lundgreen | The design, operation, and structure of the accused products. | The design, operation, and structure of the accused products; the development of the accused products. | The design, operation, and structure of the accused products and the modified LX humidifiers; Dri-Steem's development efforts with respect to gas-to-steam humidifiers in approximately 2006-2008, including consideration of a secondary heat exchanger and micro-fill technologies; the accused products opinions of counsel pertaining to invalidity of the asserted patent rendered by Patrick Johnson. |
| Dave Schwaller | [Not originally listed in Defendant's initial disclosures] | Condair's booth/displays at the January 2015 AHR trade show. | Condair's booth/displays at the January 2015 AHR trade show; Dri-Steem's development efforts with respect to gas-to-steam humidifiers in approximately 2006-2008, including consideration of a secondary heat exchanger and micro-fill technologies. |

(*Id.* at 12-14 (strikethrough in original).)

Plaintiff contends that because Schwaller was not identified as having knowledge about the 2006-2008 Development Work in the February 25 Supplement, it did not question him about that work during his deposition, and that while Plaintiff questioned Lundgreen regarding the 2006-2008 Development work, he testified that he did not have "any first-hand knowledge" of it. (*Id.* at 14.) As such, Plaintiff argues that Lundgreen

and Schwaller should not be allowed to testify about "new topics first revealed in Dri-Steem's July 19, 2022 disclosure, and identified in red in the chart."  (*Id.* at 13-15.)

As for the other witnesses at issue, the following chart created by Plaintiff shows the new topics in the July 19 Disclosures.

| Witness | First Supplement<br>February 25, 2022 | Second Supplement<br>July 19, 2022 |
|---|---|---|
| Jennifer Montville | The marketing of the accused products; the market and competition for the accused products. | The sales and marketing of the accused products and the modified [GTS-]LX humidifiers; the market and competition for the accused products and the modified [GTS-]LX humidifiers. |
| Mike Lanners | | The sales and marketing of the accused products and the modified [GTS-]LX humidifiers; the market and competition for the accused products and the modified [GTS-]LX humidifiers. |
| Mysty Hanson | | The sales and marketing of the accused products and the modified [GTS-]LX humidifiers; the market and competition for the accused products and the modified [GTS-]LX humidifiers. |

(*Id.* at 18.)

Plaintiff also generally contends that because the Modified GTS-LX Humidifiers were not on the market during the discovery process, Defendant's witnesses should not be allowed to testify about them, as they could not have been in dispute in this case until there was a sale or offer to sell pursuant to 35 U.S.C. § 271(a).  (*Id.* at 19.)

Notably, Plaintiff maintains that Defendant's July Supplementation prejudices it in "ways that cannot be cured with additional time or discovery" because it occurred "on the eve of initial expert reports" and that the "only appropriate remedy is for this Court to enter an order preventing Dri-Steem's experts and witnesses from introducing and relying on evidence pertaining to the modified design." (*Id.* at 22-23.)

### 2. Defendant's Opposition

Defendant argues that it was not obligated to supplement its disclosures under Rule 26(e) because Plaintiff became aware of the Modified GTS-LX Humidifiers through the April 6 Letter and had been aware of the 2006-2008 Development Work since November 2021, before any depositions were taken, and consequently, sanctions under Rule 37(c) are not appropriate. (Dkt. 120 at 5-6, 13-19.) Defendant further argues that "even if Rule 37(c) were in play, the Court should deny Condair's motion because any failure under Rule 26(e) was justified or harmless." (*Id.* at 5-6.)

Defendant states that on April 7, 2022, in response to the April 6 Letter, Plaintiff asked if Defendant had documents relating to the Modified GTS-LX Humidifiers. (*Id.* at 7.) Defendant provided engineering drawings of the Modified GTS-LX Humidifiers to Plaintiff on April 9, 2022 and produced test documents for it on April 12, 2022. (*Id.*) Defendant suggested that Plaintiff inspect prototypes of the Modified LX Humidifiers ("Modified Design Prototypes") on April 12, 2022, before Lundgreen's deposition, but Plaintiff declined to do so, and never scheduled an inspection of the prototypes. (*Id.*) As to the Principles of Operation Diagram, Defendant states that it provided the Diagram to its sales representatives when it began selling the Modified GTS-LX Humidifiers, but

contends that Plaintiff has not explained why that Diagram was more important than the engineering drawings produced on April 9 or why Plaintiff never inspected the Modified Design Prototypes to observe the water flow tubing/piping.  (*Id.* at 13-17, 29-30.)

Defendant contends that Plaintiff was well-aware of Defendant's witnesses through other discovery and that Plaintiff deposed all witnesses at issue.  (*Id.* at 5.) Specifically, Defendant claims that it disclosed the following witnesses to Plaintiff in its Rule 26(a)(1) disclosures: Lundgreen, Pflum, Montville, and Schwaller; that Mysty Hanson and Mike Lanners were disclosed in interrogatory responses; and that all witnesses at issue have been deposed by Plaintiff.  (*Id.* at 12-13, 17-24.)  Defendant argues this renders Rule 37(c) inapplicable, as it had no obligation to supplement its Rule 26(a)(1) disclosures, and regardless, any lack of disclosure or untimely supplementation was harmless.  (*Id.* at 24-25.)

Defendant also argues that Plaintiff knew Defendant's witnesses were knowledgeable about the Modified GTS-LX Humidifiers and knew that Lundgreen and Schwaller knew of the 2006-2008 Development Work.  (*Id.* at 19-24.)  First, as to the Modified GTS-LX Humidifiers, according to Defendant, to "the extent Condair complains that certain witnesses did not have extensive knowledge about the modified design, that is an evidentiary issue for trial."  (*Id.* at 23.)  Defendant states that Hanson testified on May 11, 2022 that Defendant expected to begin selling the Modified GTS-LX Humidifiers on May 31, 2022 and Plaintiff did not ask Lundgreen, the primary engineer involved in the development of the accused products, about the Modified GTS-LX Humidifiers during his deposition on April 12, 2022.  (*Id.* at 7-8.)  On May 9, 2022,

Defendant supplemented its response to Plaintiff's Interrogatory No. 13 to include information about the Modified GTS-LX Humidifiers "that had already been provided in April"; Plaintiff deposed Lundgreen again on May 10, 2022 as Defendant's Rule 30(b)(6) designee on various topics, including "[a]ny non-infringing alternatives that would be considered acceptable substitutes for the GTS LX Humidifiers by Dri-Steem or by customers," during which Lundgreen testified that Defendant considered the Modified GTS-LX Humidifiers to be an acceptable non-infringing alternative which Defendant expected to begin selling by the end of May 2022; and Defendant provided supplemental documents to Plaintiff, including documents pertaining to the Modified GTS-LX Humidifiers, on July 18, 2022. (*Id.* at 7-9.)

As to Pflum, Defendant argues that there is no basis to exclude his testimony because counsel instructed him "not to answer a question that would have elicited attorney work product," namely "[w]hat subjects do you intend to testify about at trial." (*Id.* at 30 (quoting Dkt. 108-7, Pl.'s Ex. P at 49:17-18).) Defendant states that Plaintiff did not ask Pflum any questions about the Modified GS-LX Humidifiers at his deposition, and therefore there is no basis to exclude his testimony on that subject. (Dkt. 120 at 30.) Defendant also contends that exclusion of testimonies of the witnesses at issue is unwarranted because there is no "surprise or prejudice" to Plaintiff. (*Id.* at 28-31.)

Second, as to the 2006-2008 Development Work, Defendant states that it produced twelve documents regarding the 2006-2008 Development Work to Plaintiff on November

30, 2021.[7]  (*Id.* at 9.)  Defendant explains that the 2006-2008 Development Work is

relevant to Claim 17 in two respects: (1) Defendant contemplated developing a gas-to-

steam humidifier with a secondary heat exchanger in 2006-2008 (where the secondary

heat exchanger is a key feature of the patented technology); and (2) Defendant was

developing a "Micro Fill" strategy using a valve that is pulsed (another element recited in

asserted Claim 17).  (*Id.* at 9.)  Defendant contends that the twelve documents it produced

in November 2021 were not sandwiched between large document productions, and in

fact, Defendant produced only thirteen documents in total at the time.  (*Id.* at 11.)

Defendant also contends that Plaintiff was aware of the 2006-2008 Development Work

earlier in the case because Defendant referenced documents pertaining to that

development work in its February 25, 2022 response to Plaintiff's Interrogatory No. 9

regarding the absence of willful infringement.  (*Id.* at 11-12.)  Then, on April 14, 2022,

Plaintiff propounded Interrogatory No. 14 regarding the 2006-2008 Development Work

and also propounded a Rule 30(b)(6) deposition topic regarding Defendant's "attempt to

develop a condensing gas-to-steam humidifier during the period of 2006-2008, including

Dri-Steem 1698-1704 and 2255-2257."  (*Id.*)

---

[7]    Defendant states November 30, 2022 in its brief.  (Dkt. 120 at 9.)  But based on the date the briefs were filed and the parties' submissions, it appears that the twelve 2006-2008 Development Documents were produced on November 30, 2021.  (*See, e.g.*, Dkt. 131 at 20:1-3 (transcript of the September 13, 2022 hearing on the Motion for Sanctions, wherein Defendant's counsel states "with respect to the development documents from 2006 to 2008, those are produced in November of 2021[.]").)

### 3.    September 13, 2022 Hearing

At the September 13, 2022 hearing on the Motion for Sanctions ("September 13 Hearing"), Plaintiff argued that Defendant's damages and technical experts made "liberal use" of the information produced with the July 19 Supplement regarding the Modified GTS-LX Humidifiers in their reports, including that it was a non-infringing substitute, and criticized Plaintiff's experts for not considering it.  (Dkt. 131 at 4:9-5:3.)  Plaintiff claimed that its discovery requests, including Request for Production No. 57, sought all documents pertaining to the Modified GTS-LX Humidifiers, but Defendant nonetheless failed to provide responsive answers/documents until July 19, 2022; Defendant has still not provided all responsive documents, including drawings showing the interior of the Modified GTS-LX Humidifiers to show the water flow piping; and the information included in Defendant's damages expert's report shows the design-around process began in mid-February 2022.  (*Id.* at 4:17-5:12; 6:5-7:21; 8:16-11:18.)  Plaintiff contended that the CAD drawings Defendant produced showed the outside hose connections of the Modified GTS-LX Humidifiers, but not the internal operation/water flow piping, so its expert was unable to determine the "complete flow" of water; that the flow of water from the "valve into the primary heat exchanger is critical to determining whether or not there is a new noninfringement position with respect to the" Modified GTS-LX Humidifiers; and that Defendant's damages and technical experts did not utilize the CAD drawings in their report and Defendant's technical expert instead cited the drawings that were produced on July 19, 2022.  (*Id.* at 5:13-8:10.)

Plaintiff asserted its belief that Defendant's technical expert was unable to use the CAD drawings in his report regarding noninfringement and stated that Defendant's technical expert failed to offer an opinion that the Modified GTS-LX Humidifiers did not infringe. (*Id.* at 8:11-24.) However, according to Plaintiff, the expert did use the Principle of Operation Diagram when opining on obviousness and secondary considerations. (*Id.* at 8:24-9:15; 13:21-14:20; 32:15-5; 35:5-13.) According to Plaintiff, the April 6 Letter did not state that the Modified GTS-LX Humidifiers were a noninfringing substitute. (*Id.* at 33:18-34:1.)

As to an inspection, Plaintiff's counsel stated that "absent cutting open the secondary heat exchanger of the prototype that they were testing to be released as a commercial embodiment on June 15th, in one aspect we thought also that such a visual inspection would be pointless." (*Id.* at 14:9-12.) However, he then conceded that he did not know if utilizing a camera would have shown the internal parts of the secondary heat exchanger and that Plaintiff's technical experts may have had ideas about how to determine the water flow, but said having counsel look at the outside of the Modified Design Prototypes "is not going to be helpful in the week of depositions." (*Id.* at 14:13-20.) Plaintiff further argued that it was taking depositions and received thousands of documents to review in April and May; it had no notice of Defendant's intent to assert the Modified GTS-LX Humidifiers as a noninfringing substitute in relation to damages or secondary considerations; it considered the information received in the April 6 Letter part of the settlement discussions, not part of the case; and the Modified GTS-LX Humidifiers

could not have been formally accused of infringement until they were sold on June 15, 2022. (*Id.* at 12:2-14:20.)

As to Plaintiff's arguments relating to witnesses' personal knowledge, Plaintiff conceded that issues relating to its questioning of Defendant's witnesses at depositions pertained to admissibility, not discoverability. (*Id.* at 17:18-18:3.) However, Plaintiff continued to assert that Defendant's failure to timely disclose additional topics that its witnesses were expected to testify about violated Rule 26. (*Id.* at 16:24-19:15.) In response to the Court's question as to "why can't [any untimely disclosure] be cured by simply having your expert offer the appropriate opinions, appropriate for you, I should say," Plaintiff responded that any remedy short of striking Defendant's experts' opinions discussing the Modified GTS-LX Humidifiers, including providing a supplemental infringement report or the production of additional documents, would create a delay in the Scheduling Order and result in Plaintiff incurring substantial additional expenses. (*Id.* at 15:3-16:20; 34:15-35:4.)

As for Defendant's argument, it maintained that it specifically amended its response to Interrogatory No. 9 in February 2022 to reference documents pertaining to the 2006-2008 Development Work that were initially produced in November 2021; it notified Plaintiff about the Modified GTS-LX Humidifiers in the April 6 Letter, before any depositions were taken in this case; and Plaintiff's counsel asked Schwaller, who was identified as a project manager for the 2006-2008 Development Work, questions about an Excel spreadsheet attached to a PowerPoint regarding the "possibility of using a secondary heat exchanger" that Schwaller authored and was produced as part of the

November 2021 production ("PowerPoint"). (*Id.* at 20:1-23:9.) Defendant argued that Lundgreen was identified as its main technical witness at the early stages of this case and that although Lundgreen did not specifically work on the 2006-2008 Development Work, he worked in the lab where he performed testing and was exposed to it. (*Id.* at 23:10-24; 24:5-16.) According to Defendant, Lundgreen was asked about the PowerPoint as well as about a document pertaining to Defendant's water-filling strategies for its micro-fill technology relating to the pulsed valve element of Claim 17, but Plaintiff failed to ask him questions about the Modified GTS-LX Humidifiers even though he created and tested those devices. (*Id.* at 23:25-24:16; 31:15-22.)

Defendant explained that it began working on the Modified GTS-LX Humidifiers in February 2022 and represented that it intentionally put Plaintiff on notice of its existence before depositions given the potential effect the modified design would have on damages, including a reasonable royalty and lost profits. (*Id.* at 24:17-25:22.) Defendant said it did not disclose the Modified GTS-LX Humidifiers for purposes of secondary considerations because Plaintiff had not served applicable discovery. (*Id.* at 29:19-30:7.) Defendant's counsel did not know when the cartoon drawing was created, but represented that it was not sent to Defendant's sales representatives until the end of June 2022. (*Id.* at 31:4-13.) Moreover, to the extent the cartoon drawing existed before then, it was in draft form, and Defendant maintained that it had produced all documents relating to the Modified GTS-LX Humidifiers to Plaintiff. (*Id.* at 30:8-32:5.)

Defendant contended that it was not aware of Plaintiff's complaint that it was unable to see the water connections based on the CAD drawings until Plaintiff filed the

Motion for Sanctions and did not know that Plaintiff believed it would have to take apart or break open the Modified GTS-LX Humidifiers to observe the water flow until the September 13 Hearing.  (*Id.* at 25:23-26:19.)  Defendant also argued that, regardless of those concerns, Plaintiff did not explain why it did not conduct an inspection of the Modified GTS-LX Humidifiers in June or July 2022.  (*Id.* at 25:23-28:24.)  Moreover, as to the need to see the inside of the Modified Design Prototypes, Defendant claimed that Plaintiff purchased the accused product and that based on Plaintiff's expert's infringement report, it did not appear that the heat exchanger of the accused product was taken apart for inspection, thus undermining Plaintiff's argument that it was necessary to do so for the Modified Design Prototypes.  (*Id.* at 27:15-28:8.)

As to Plaintiff's argument that the Modified GTS-LX Humidifiers were not at issue in the case before they were on sale, Defendant noted that whether an alternative product is or was on sale is not important for the purposes of lost profits.  (*Id.* at 28:25-29:14.)  Finally, Defendant responded to Plaintiff's argument that Defendant's expert had not opined that the Modified GTS-LX Humidifiers did not infringe by identifying the paragraph in the invalidity report (paragraph 151) where he did in fact opine that those products do not infringe Claim 17, and also stated that the expert provided a noninfringement opinion as to those products in his noninfringement report that was served on Plaintiff on July 25, 2022.  (*Id.* at 35:16-36:24.)

## B.    Legal Standard

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery.  *See* Fed. R. Civ. P. 26.  Under Rule 26(a)(1)(A)(i), a party to a litigation must

provide other parties "the name, and if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]" Fed. R. Civ. P. 26(a)(1)(A)(i). Pursuant to Rule 26(e), a party that has made a disclosure under Rule 26(a) or that has responded to discovery requests, must supplement or correct its disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.[]" Fed. R. Civ. P. 26(e)(1)(A).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Because Rule 37(c) sanctions are mandatory, the rule contains exceptions for 'substantially justified' or 'harmless' violations to 'avoid unduly harsh penalties that may result from an inflexible application of the Rule.'" *United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, No. 13-CV-3003 (WMW/DTS), 2021 WL 101193, at *22 (D. Minn. Jan. 12, 2021) (quoting *Transclean Corp. v. Bridgewood Servs., Inc.*, 101 F. Supp. 2d 788, 795 (D. Minn. 2000)). "[A] critical consideration [is] the prevention of unfair surprise." *Transclean*, 101 F. Supp. 2d at 795 (citing *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995)). District courts therefore consider four factors when determining whether a

violation was substantially justified or harmless under Rule 37(c): "'[1] the importance of the excluded material; [2] the explanation of the party for its failure to comply with the required disclosure; [3] the potential prejudice that would arise from allowing the material to be used . . .; and [4] the availability of a continuance to cure such prejudice.'" *Fesenmaier*, 2021 WL 101193, at *22 (quoting *Transclean*, 101 F. Supp. 2d at 795-96); *see also Bison Advisors LLC v. Kessler*, No. CV 14-3121 (DSD/SER), 2016 WL 3525900, at *2 (D. Minn. Jan. 21, 2016) (same factors). "[T]he exclusion of evidence is a harsh penalty and should be used sparingly." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008) (quoting *ELCA Enters. v. Sisco Equip. Rental & Sales*, 53 F.3d 186, 190 (8th Cir. 1995)).

"The party moving to strike an expert report or any portion thereof bears the burden of showing a discovery violation has occurred." *Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*, No. 12-cv-2706 (ADM/LIB), 2016 WL 8291968, at *8 (D. Minn. April 19, 2016). "The threshold question in deciding whether to strike an expert report is whether the expert has permissibly specified the application of a disclosed theory or impermissibly substituted a new theory altogether. If a theory was previously disclosed, the expert's further explanation of that theory is proper as elaboration on the previously disclosed theory." *Id.* at *9 (citations and quotations omitted).

C.    **Analysis of Plaintiff's Motion to Strike**

Plaintiff seeks exclusion of certain expert opinions and witnesses' testimony relating to the Modified GTS-LX Humidifiers and 2006-2008 Development Work, which the Court addresses individually below.

### 1.    Whether Defendant's Experts Can Rely on the Modified GTS-LX Humidifiers and Principle of Operation Diagram in Their Reports

Plaintiff argues that on July 18, 2022, Defendant produced the Principle of Operation Diagram and then disclosed the Modified GTS-LX Humidifiers in a supplemental interrogatory response on July 19, 2022, even though the Modified GTS-LX Humidifiers were first sold on June 15, 2022, and that due to Defendant's "untimely disclosure," its expert was unable to investigate and analyze the Modified GTS-LX Humidifiers and utilize the Principle of Operation Diagram in his report.  (Dkt. 106 at 2-12.)  According to Plaintiff, Defendant's untimely production violates Rule 26(e)(1)(A), warranting exclusion of portions of Defendant's experts reports discussing the Modified GTS-LX Humidifiers and Principle of Operation Diagram under Rule 37(c).  (Dkt. 105 at 1; Dkt. 106 at 22-23.)  Defendant counters that sanctions under Rule 37(c) are unwarranted, and that regardless, the Court should deny Plaintiff's request because any failure to timely supplement its discovery materials under Rule 26(e) was justified or harmless.  (Dkt. 120 at 5-6, 13-17.)

As stated above, Rule 26(e)(1)(A) requires timely supplementation of discovery materials "if the party learns that in some material respect the [prior] disclosure or response is incomplete or incorrect, and **if the additional or corrective information has**

**not otherwise been made known to the other parties during the discovery process or in writing**." Fed. R. Civ. P. 26(e)(1)(A) (emphasis added).

It is undisputed that the April 6 Letter Defendant sent to Plaintiff states:

Dri-Steem has developed a design alternative that surely does not infringe any claim of the '372 patent or any foreign patents in the family. For the new design, the alleged "primary valve" is disconnected from its current location and instead connected to the secondary heat exchanger. Therefore, both valves feed water into the secondary heat exchanger.

Dri-Steem has built and tested prototypes of this new design. Because those tests have been successful, Dri-Steem has initiated steps to begin manufacture and shipment of humidifiers with the new design, such as updating its formal engineering drawings and standard parts. Once Dri-Steem is ready to commence shipments of humidifiers with this new design, it plans to cease shipments of humidifiers with the current design. Dri-Steem expects to begin shipping the new units in approximately one month. Because Dri-Steem manufactures its LX humidifiers on demand, it will not have any inventory of unsold humidifiers with the current design at the time of this change.

Dri-Steem continues to vigorously dispute liability for sales of humidifiers with its current design. But even if Condair were to prevail on liability with respect to the current design, this design change will have a profound impact on Condair's potential recovery in several ways. First, it limits any potential damages to only past sales. Second, any potential royalty would be low given how quickly and inexpensively Dri-Steem has been able to implement this design change. *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015) ("When an infringer can easily design around a patent and replace its infringing goods with non-infringing goods, the hypothetical royalty rate for the product is typically low."). And finally, it further reduces the already low potential for a finding of willful infringement or exceptional case (and, thus, any potential award of enhanced damages or attorneys' fees).

Given the number of upcoming depositions, it is clear that the cost of further litigation will significantly exceed any potential damages award in this case. If Condair is interested in discussing settlement in light of this design change, please let us know if Condair has a specific monetary demand in mind. If Condair is not interested, we will proceed with our defenses.

(Dkt. 108-1, Pl.'s Ex. L at 2-3.)

Upon receiving that letter, on April 7, 2022, Plaintiff sought "updated formal engineering drawings, and images of the humidifier made according to this new design[,]" in accordance with its Request for Production 20, which asks for "[a]ll documents relating to any attempts to design around or modify any Accused Product to avoid infringement of the Patent-in Suit and/or in light of any Underlying Application." (Dkt. 121-1, Def.'s Ex. 1 at 5.)  On April 8, 2022, Defendant responded that "[we] do not have many documents yet, but will get you what we have. . . . If you would like, you could come inspect the prototypes on Tuesday before Jim Lundgreen's deposition, and we could reschedule Baird/Schwaller for a different day.  Up to you."  (*Id.* at 4.)  On April 8, 2022, Plaintiff responded that it did not want to reschedule the depositions of Baird or Schwaller but "may be interested in viewing the prototypes on Tuesday afternoon after the Schwaller deposition.  Alternatively, we will be back in Minneapolis on either 4/18 or 4/19.  Would it be possible to inspect the prototypes on either of those days?"  (*Id.*)  On April 8, 2022, Defendant's counsel confirmed that she "will have to look into 4/18 and 4/19, and won't know until next week.  Next Tuesday after Schwaller is a possibility if we don't finish too late[,]" and thereafter, sent Plaintiff an engineering drawing of the Modified GTS-LX Humidifiers on April 9, 2022.  (*Id.* at 2-3.)

Based on the above, it is clear that Plaintiff was aware of the Modified GTS-LX Humidifiers and Defendant's belief that they do not infringe since early April 2022, and as stated previously, "[s]upplementation is not required where supplemental or corrective information has been otherwise made known to the parties in writing or during the discovery process."  *Hysitron Inc. v. MTS Sys. Corp.*, Civ. No. 07-1533 (ADM/AJB),

2010 WL 55987, at *8 (D. Minn. Jan. 4, 2010); *see also Tomlinson v. J.B. Hunt Transp., Inc.*, 989 F. Supp. 2d 766, 776 (D. Minn. 2013) ("There is no requirement to supplement if the information was otherwise made known to the opposing party during the discovery process."). Plaintiff argues that the April 6 Letter was inadequate to have put it on notice about the Modified GTS-LX Humidifiers as that letter was issued for purposes of settlement discussions and was not a part of the "damages case." (Dkt. 131 at 12:16-24.) The Court is unpersuaded. The April 6 Letter stated that Defendant's design-around "will have a profound impact on Condair's potential recovery," including by "limit[ing] any potential damages to only past sales" and reducing "any potential royalty." (Dkt. 108-1, Pl.'s Ex. L at 2-3 (citing *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015) ("When an infringer can easily design around a patent and replace its infringing goods with non-infringing goods, the hypothetical royalty rate for the product is typically low.")).) Plainly, Defendant believed its new design to be a non-infringing alternative and intended to use it for its damages case, and given Defendant's disclosures relating to the Modified GTS-LX Humidifiers in April 2022, Plaintiff was not unfairly surprised by the July Supplementation.

Moreover, Plaintiff was offered an opportunity to inspect the Modified Design Prototypes of the Modified GTS-LX Humidifiers in April 2022 but declined to do so at that time or any other. Plaintiff argued at the September 13 Hearing that it would have had to open the secondary heat exchangers of the Modified GTS-LX Humidifiers to determine the water flow tubing/piping and claimed that it was not until it received the Principle of Operation Diagram that it determined there were missing details in the CAD

drawings. (Dkt. 131 at 25:23-28:24.) Plaintiff has not given any reasonable explanation as to why it needed the Principle of Operation Diagram to discover that it could not determine the water flow tubing/piping from the CAD drawings. Surely, the inability to determine the water flow tubing/piping was evident from the CAD drawings themselves. Moreover, Plaintiff did not inform Defendant of the need to open the secondary heat exchanger until the September 13 Hearing; seek additional discovery or to reopen any depositions to question witnesses about the Modified GTS-LX Humidifiers, even after Hanson testified as Defendant's Rule 30(b)(6) witness on May 11, 2022 that Defendant expected to "launch" the Modified GTS-LX Humidifiers on May 31, 2022 (*see* Dkt. 108-6, Pl.'s Ex. O at 31:14-32:23); or state why it failed to consider other ways it could have determined the internal components of the secondary heat exchanger. *See Transclean Corp. v. Bridgewood Services, Inc.*, 77 F.Supp.2d 1045, 1061 (D. Minn. 1999) ("As the latter part of the Rule conveys, the duty to supplement is excused . . . if the information at issue has already been revealed by a witness in a deposition or otherwise through formal discovery, or alternatively, by providing the additional information in writing.") (citations and quotations omitted).

Additionally, on May 9, 2022, Defendant supplemented its answer to Plaintiff's Interrogatory No. 13 before fact discovery closed, stating:

> Dri-Steem has been working on a modification to its accused LX humidifiers. In the modification, the alleged "primary valve" is disconnected from its current location and instead connected to the secondary heat exchanger. Therefore, both valves feed water into the secondary heat exchanger. See DRI-STEEM-0039885- DRI-STEEM-0039893. As of the date of this response, this design has not been sold or publicly disclosed.

(Dkt. 107-1, Pl.'s Ex. C at 5; Dkt. 121-4, Def.'s Ex. 4 at 5.)

Plaintiff argues that "there cannot be infringement until there has been either a sale or offer [of] sale of the allegedly infringing device" and that the Modified GTS-LX Humidifiers were not offered for sale or sold until June 15, 2022. (Dkt. 106 at 19.) This misses the point. It is plain from the April 6 Letter that Defendant intended to offer its design change for sale, including because the Letter discussed cutting off damages to past sales. Moreover, the damages analysis does not require the alleged acceptable noninfringing substitute to have actually been manufactured and sold. *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978) (finding "a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.").

Neither has Plaintiff sufficiently explained why receiving the Principle of Operation Diagram was more important or relevant than inspecting the Modified Design Prototypes. Plaintiff argues that it was taking depositions and handling other matters in April and May 2022 and was thus unable to analyze and inspect the CAD drawings and the Modified GTS-LX Humidifiers. (Dkt. 131 at 12:5-15.) But Plaintiff is represented by a firm with several lawyers and the fact that it had various obligations in this case does not justify its inaction or absolve it from tending to other obligations. *See Unverferth Mfg.*, 2021 WL 297132, at *3 (dismissing Defendant's argument that its engagement in depositions and briefing discovery motions obstructed it from filing a motion to amend and noting "[b]ut that Meridan had other obligations in this case does not explain why it

could not have moved to amend earlier in time"). The Court also questions the fairness of imposing the harsh remedy of exclusion when part of the reason Plaintiff did not inspect the Modified Humidifier Prototypes before the expert report deadline is that counsel were busy with other matters in the case.

Plaintiff argues that Defendant's expert reviewed and considered the Principle of Operation Diagram in "making his obviousness-secondary consideration arguments" and used the Modified GTS-LX Humidifiers in arguing that Claim 17 is not responsible for market success, thereby prejudicing Plaintiff because its own expert was unable to utilize those materials. (Dkt. 106 at 3, 11.) However, as stated above, Plaintiff could have sought discovery into the design change, or had its experts inspect and analyze the Modified Design Prototypes, well before the July 21, 2022 initial expert report deadline—or sought to serve supplemental expert reports after receiving the July 19 Supplementation.

Finally, at the September 13 Hearing, Plaintiff claimed it was unaware that Defendant intended to use the Modified GTS-LX Humidifiers as a noninfringing alternative for purposes of damages or secondary considerations. (Dkt. 131 at 12:16-13:24.) As stated above, this argument is not plausible in view of the April 6 Letter and subsequent correspondence, including the production of engineering drawings. Further, at Lundgreen's May 10, 2022 deposition as Defendant's Rule 30(b)(6) designee, he testified that Defendant considered the Modified GTS-LX Humidifiers to be an acceptable non-infringing alternative, that testing for the Modified GTS-LX Humidifiers had been completed, that production of the Modified GTS-LX Humidifiers were expected

54

to begin at the "end of this month," and stated that Defendant expected to begin selling the Modified GTS-LX Humidifiers "by the end of the month."  (*See* Dkt. 108, Pl.'s Ex. K at 220:23-223:21.)  As previously stated, "the duty to supplement is excused . . . if the information at issue has already been revealed by a witness in a deposition."  *Transclean*, 77 F. Supp. 2d at 1061.

For all of these reasons, the Court finds that Defendant's July 19 Disclosures do not violate Rule 26(e), as they did not contain information not previously disclosed by the April 6 Letter, the CAD drawings provided on April 9, and Lundgreen's and Hanson's deposition testimony—not to mention the availability of the Modified Design Prototypes for inspection.  Because the Court finds Defendant was not required to supplement its discovery responses under Rule 26(e), it need not analyze whether Defendant should be sanctioned under Rule 37(c).  *See Grupo Petrotemex, S.A. de C.V. v. Polymetrix AG*, Case No. 16-cv-02401 (SRN/HB), 2021 WL 1239894, at *10 (D. Minn. April 2, 2021) ("Therefore, the Court finds that Polymetrix was not required to supplement its initial disclosure under Rule 26(e).  Consequently, the Court need not analyze whether Polymetrix's non-disclosure was harmless.  Because the Court finds that Polymetrix did not violate its obligations under Rule 26(e), it denies GPT/DAK's motion to strike. . .") (footnote omitted).

Further, even if the Court did find a violation of Rule 26(e), the Court would not grant the extreme sanction of striking Defendant's experts' opinions.  "[E]xclusion of evidence is a harsh penalty and should be used sparingly."  *ELCA Enters*, 53 F.3d at 190.  Here, in view of Defendant's pre-deposition disclosures relating to the Modified GTS-LX

Humidifiers and offer to make the Modified Design Prototypes available for inspection, the harsh penalty would not be appropriate. Plaintiff has not offered a satisfactory reason as to why it chose not to pursue any discovery into the Modified Design Prototypes between April and July 2022 or address the re-design in its expert reports.[8] Finally, in view of Plaintiff's position that the only way to cure the alleged Rule 26(e) violation is by striking the expert opinions and precluding expert testimony rather than re-opening depositions, permitting Plaintiff to serve supplemental expert reports, or some other alternative remedy (Dkt. 131 at 15:3-8-16:20; 34:15-18), the Court does not consider any such alternative remedy at this time.

### 2. Whether Defendant's Witnesses' Testimonies Should Be Excluded Based on the July 19 Disclosures

Plaintiff contends that Defendant's July 19 Disclosures added "new topics of testimony on critical subjects that witnesses did not answer, or were instructed not to answer, during their depositions." (Dkt. 106 at 2-5.) Specifically, Plaintiff takes issue with the July 19 Disclosures as it relates to the following witnesses: Lundgreen, Schwaller, Montville, Lanners, Pflum, and Hanson. (*Id.* at 12-22.) The Court addresses each witness below.

---

[8] Plaintiff relies on *Wing Enterprises, Inc. v. Tricam Industries, Inc.*, No. 17-cv-1769, 2018 WL 6326416 (D. Minn. Dec. 4, 2018), in its brief. (Dkt. 106 at 10-12.) This argument would have been more persuasive had Defendant not sent the April 6 Letter disclosing both the Modified GTS-LX Humidifiers and Defendant's intent to use them as non-infringing alternatives, produced documents describing those products, and offered an inspection of the Modified Design Prototypes before any of the witnesses at issue were deposed.

### a.      Jim Lundgreen and David Schwaller

Defendant's initial Rule 26(a)(1) disclosures listed the following subject matter for Lundgreen's testimony: "The design, operation, and structure of the accused product[;]" its February 25 Supplement added the following topic: "the development of the accused products[;]" and that the July 19 Disclosures lists the following topics: "The design, operation, and structure of the accused products and the modified [GTS-]LX humidifiers, Dri-Steem's development efforts with respect to gas-to-steam humidifiers in approximately 2006-2008 including consideration of a secondary heat exchanger and micro-fill technologies, the opinions of counsel pertaining to invalidity of the asserted patent rendered by Patrick Johnson." (*Id.* at 12-14.) As to Schwaller, Plaintiff argues that Defendant did not list him in its initial disclosures and listed the following topic for him in its February 25 Supplement: "Condair's booth/displays at the January 2015 AHR trade show[,]" but that the July 19 Disclosure adds the following topic: "Dri-Steem's development efforts with respect to gas-to-steam humidifiers in approximately 2006-2008 including consideration of a secondary heat exchanger and micro-fill technologies." (*Id.*) Plaintiff claims it would have questioned Lundgreen and Schwaller regarding the topics listed in the July 19 Disclosures had Defendant provided that information prior to their depositions, and therefore seeks "an order preventing Mr. Lundgreen and Mr. Schwaller from testifying about new topics first revealed in Dri-Steem's July 19, 2022

disclosure," including the Modified GTS-LX Humidifiers and the 2006-2008 Development work. (*Id.* at 12-13; *see also* Dkt. 105 at 1.)[9]

Defendant responds that Lundgreen and Schwaller's identities were made known to Plaintiff through discovery responses, and so there was no need for it to supplement its initial disclosures, and that regardless, Plaintiff deposed these witnesses and thus had the opportunity to ask questions relating to the Modified GTS-LX Humidifiers and the 2006-2008 Development Work. (Dkt. 120 at 5, 7-9.)

Plaintiff's Interrogatory No. 4 asks Defendant to "[i]dentify by name, model number, and any other identifying indicia, each Accused Product and for each product, identify the individuals responsible for its design, development, marketing, manufacture, testing, and sales." (*See* Dkt. 121-2, Def.'s Ex. 2 at 5.) On February 25, 2022, Defendant responded to that interrogatory, stating in pertinent part: "Jim Lundgreen has been primarily responsible for the design, development, and testing of the LX series humidifiers." (*Id.*) Defendant's answer to Interrogatory No. 4 alone should have put Plaintiff on notice as to any potential knowledge Lundgreen may have had about the Modified GTS-LX Humidifiers and the 2006-2008 Development Work, especially since

_____

[9] The Court notes that Plaintiff also appears to argue it was prevented from seeking discovery regarding topics listed in the February 25 Supplement for Lundgreen and Schwaller. (*See* Dkt. 106 at 13, stating "Condair was prevented from seeking discovery about the following additions, which directly impact issues in Condair's expert reports and are underlined and shown in red below," showing the topics in the February 25 Supplement in "red.") To the extent Plaintiff makes this argument, the Court rejects it as the record is clear that Lundgreen was first deposed by Plaintiff on April 12, 2022 and again on May 10, 2022, and Schwaller was deposed on April 12, 2022, well after the February 25, 2022 supplement was made. (*See* Dkt. 109-3; Pl.'s Ex. J at 3-4; *see also* Dkt. 108, Pl.'s Ex. K; Dkt. 120 at 7-8; Dkt. 122-5, Def.'s Ex. 11.)

Lundgreen also verified Defendant's February 25, 2022 interrogatory responses. *See Fair Isaac Corp. v. Fed. Ins. Co.*, 447 F.Supp.3d 857, 884 (D. Minn. 2020) ("Indeed, FICO concedes that it knew of Sullivan from documents produced in discovery and because Sullivan was included in a response to one of FICO's interrogatories. 'There is no requirement to supplement if the information was otherwise made known to the opposing party during the discovery process.'") (citation omitted); *see also Tomlinson*, 989 F. Supp. 2d at 776 (denying plaintiff's motion to strike the declaration of defendant's unidentified witness and finding plaintiff had "notice of Griffin's knowledge of Defendant's policies, procedures, and documents based on the January 31, 2013 interrogatory response and verification") (citing *Brown v. Chertoff,* No. 406CV002, 2009 WL 50163, at *5–6 (S.D. Ga. Jan. 7, 2009) ("holding declarants were sufficiently revealed when, in response to interrogatories, party wrote that the two declarants 'provided the information necessary to answer this interrogatory.'"), *aff'd* 380 F. App'x 832 (11th Cir. 2010)).

Moreover, Plaintiff deposed Lundgreen on two occasions, once as an individual on April 12, 2022 and then as Defendant's Rule 30(b)(6) designee on May 10, 2022. (*See* Dkt. 108, Pl.'s Ex. K; *see also* Dkt. 120 at 7.)  Plaintiff claims Lundgreen did not have "first-hand knowledge" of the 2006-2008 Development Work but conceded at the September 13 Hearing that the issue is one of admissibility, not discoverability. *See* Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable."); *see also Chisum v. Mercedes-Benz USA, LLC*, 534 F. Supp. 3d 608, 613 (M.D. La. 2021) ("[D]iscoverability and admissibility are different

issues.").  Regardless, the transcript for Mr. Lundgreen's May 10 deposition shows

counsel asked extensive questions about the 2006-2008 Development Work and

questioned him regarding the Modified GTS-LX Humidifiers (*see generally* Dkt. 108,

Pl.'s Ex. K.), and as stated above, "the duty to supplement is excused . . . if the

information at issue has already been revealed by a witness in a deposition . . . ."

*Transclean*, 77 F. Supp. 2d at 1061; *see also BVS, Inc. v. CDW Direct, LLC*, No. 11-CV-

79-LRR, 2013 WL 12140978, at *5 (N.D. Iowa March 15, 2013) (finding that because

the defendant's witness testified about the topics at issue during his deposition,

Defendant was not required to supplement its Rule 26 disclosure as to those topics and

that "even if [defendant's] disclosures were incomplete with respect to the subject matter

of Harb's testimony, any omission became known to [plaintiff] during the discovery

process when counsel deposed [defendant's witnesses]").

As to Schwaller, Plaintiff deposed him on April 12, 2022 and had the opportunity

to ask questions regarding the Modified GTS-LX Humidifiers and 2006-2008

Development Work, but failed to do so.  (*See* Dkt. 122-5, Def.'s Ex. 11.)  Plaintiff knew

Schwaller had been employed with Defendant since May 1997 and that he had held

several positions as an engineer and manager during his time with Defendant.  (*See id.* at

7:25-9:5 (Plaintiff introduced Schwaller's LinkedIn profile describing his employment

roles with Defendant at the deposition, marked as Dep. Ex. 49).)  Plaintiff claims it

confined its questioning only to the topics listed in Defendant's February 25 Disclosures,

but given that Plaintiff had learned about Defendant's re-design efforts through the April

6 Letter and April 9 production of engineering documents, Plaintiff has not explained

why it did not ask Schwaller any questions about these efforts when deposing him three days later.  To the extent Plaintiff suggests that Defendant would not have permitted questioning outside of the topics identified in the Rule 26(a)(1) disclosures, this is not persuasive as "the Rules of Civil Procedure specifically provide that depositions *are not* limited by rules regarding relevance, the witness must answer despite objections (with a few exceptions, such as for privilege), and the Court should allow additional time for a deposition if needed." *Constr. Sys., Inc. v. Gen. Cas. Co. of Wisconsin*, No. CIV. 09-3697 RHK/JJG, 2011 WL 3625066, at *14 n.14 (D. Minn. Aug. 17, 2011) (citing Fed. R. Civ. P. 30(c).)  Plaintiff has cited no authority for the proposition that its deposition questioning was limited by the Rule 26(a)(1) disclosures, nor provided any example of witnesses refusing to answer except when asked what topics they would be testifying about at trial.

Given that Lundgreen had previously been disclosed as having information about the design, operation, and structure of the accused products, that Plaintiff was aware of Schwaller's long-term engineering and managerial employment with Defendant, and that Defendant believed its re-design efforts were fruitful as of the April 6 Letter, the Court finds no violation of Rule 26(e) based on the fact that Defendant's Rule 26(e) disclosures were not immediately supplemented to cover the Modified GTS-LX Humidifiers and 2006-2008 Development Work.  For all of these reasons, the Court denies Plaintiff's Motion for Sanctions as to Lundgreen and Schwaller.

### b.    Jennifer Montville

Plaintiff claims that while Defendant's February 25 Supplement lists Jennifer Montville as having knowledge of the marketing and market and competition of the accused products, the July 19 Disclosures states she also has knowledge of the sales and marketing of, and market and competition for the Modified GTS-LX Humidifiers.  (Dkt. 106 at 18.)  Plaintiff deposed Montville on April 11, 2022, but argues that she should not be allowed to testify about the Modified GTS-LX Humidifiers due to the late July 19 Disclosures.  (*See* Dkt. 108-2, Pl.'s Ex. M-1; *see also* Dkt. 108-3, Pl.'s Ex. M-2, Dkt. 108-4, Pl.'s Ex. M-3; Dkt. 106 at 15-16; Dkt. 105 at 1.)

At her deposition, Montville testified extensively about her duties as Defendant's Director of Marketing, including "lead[ing] the group of product managers, each of whom has direct responsibility for a set of products."  (Dkt. 108-2, Pl.'s Ex. M-1 at 10:13-22:16.)  Counsel asked Montville the following questions regarding the Modified GTS-LX Humidifiers:

> Q.    Mrs. Montville, are you aware of any new gas-to-steam prototypes at Dristeem?
>
> A.    We continuously review technology for all of our products.
>
> Q.    Are you aware of any physical prototypes of gas-to-steam humidifiers.
>
> A.    I haven't seen any new prototypes.

(Dkt. 108-4, Pl.'s Ex. M-3, at 13:5-11.)

This testimony is hardly grounds to preclude Montville from testifying about marketing and sales for the Modified GTS-LX Humidifiers.  The fact that Montville

testified that she had not seen any new prototypes does not mean she refused to answer questions about the sales and marketing of the Modified GTS-LX Humidifiers. Further, Plaintiff was aware of Montville's role as Defendant's Director of Marketing and knew about the re-design efforts before her April 11 deposition. In view of these facts, the Court finds no Rule 26(e) violation based on the July 19 Disclosures. Finally, to the extent there was any Rule 26(e) violation with respect to Montville, the Court finds it was harmless under these circumstances. *See BVS, Inc.*, 2013 WL 12140978, at *5 ("When determining whether CDW's alleged violation of Rule 26(a) 'was substantially justified or is harmless,' Fed. R. Civ. P. 37(c)(1), the court considers, among other things, 'the surprise and prejudice' to BVS. Here, the court finds that there is no surprise to BVS because BVS had knowledge of Harb's position as a CDW Executive Account Manager, that Harb was in charge of the BVS account and the long-standing relationship and prior course of dealing between BVS and CDW.") (citing *Wegener*, 527 F.3d at 692). Plaintiff cannot be unfairly surprised that the Director of Marketing identified as testifying about the sales and marketing of Defendant's GTS-LX Humidifiers also intends to testify about the sales and marketing of Defendant's Modified GTS-LX Humidifiers.

### c.    Michael Lanners and Mysty Hanson

Lanners and Hanson were added as witnesses in Defendant's July 19 Disclosures, and Plaintiff claims that Lanners testified at his deposition that "he knew very little about any new prototype or redesigned version of the GTS LX"; that as Defendant's Rule 30(b)(6) designee on marketing and sales, Hanson testified that "there would be no marketing of the Modified GTS-LX Humidifier because customers would not know the

difference between the previous design and modified design"; and that as a result of the untimely July 19 Disclosures, both should be precluded from testifying regarding the Modified GTS-LX Humidifiers.  (Dkt. 106 at 16-18, 18 n.8.)

The Court denies the Motion for Sanctions as to Lanners and Hanson for essentially the same reasons as the other witnesses.  As of February 25, 2022, Plaintiff knew that: "The manufacture of the LX series humidifiers is done by a number of Dri-Steem employees who work in the manufacturing portion of Dri-Steem's facility.  Mysty Hanson has been primarily responsible for marketing the LX series humidifiers.  Mike Lanners has been primarily responsible for overseeing sales of the LX series humidifiers."  (Dkt. 121-2, Def.'s Ex. 2 at 5.)

Plaintiff deposed Lanners on May 3, 2022, and deposed Hanson twice, once as an individual on May 4, 2022, and a second time on May 11, 2022 as Defendant's Rule 30(b)(6) designee on marketing and sales.  (*See* Dkt. 108-5, Pl.'s Ex. N; *see also* Dkt. 108-6, Pl.'s Ex. O; Dkt. 120 at 13.)  At his deposition, Lanners testified that he was Defendant's Director of Sales and about the duties associated with his role.  (*See* Dkt. 108-5, Pl.'s Ex. N at 8:15-10:17.)  Counsel asked Lanners the following questions regarding the Modified GTS-LX Humidifiers:

Q.    Are you aware of a new prototype LX humidifier at DriSteem?

A.    Yes.

Q.    What do you know about the new prototype LX humidifier at DriSteem?

A.    Very little.  I know that there's a small design change that's being made.

Q.    Okay.

(*Id.* at 77:24-78:9.)

At her deposition as Defendant's Rule 30(b)(6) designee, Hanson gave the

following testimony:

Q.    If I refer to a new updated LX, do you know what I'm referring to?

A.    Yes.

Q.    What do you understand the new updated LX to be?

A.    The updated LX has the -- a fill line that has -- that is now connected to the secondary heat exchanger.  So it fills through the secondary heat exchanger into the tank.

Q.    And when is DriSteem plaining to lunch the new LX model?

A.    By May 31st.

Q.    With respect to capacity to market, what has DriSteem done to launch the new LX model?

A.    We have not done anything for marketing to launch the new LX model.

Q.    So will marketing start then on or after May 31st?

A.    We really don't have any plans to market anything about the new design.

Q.    Why does DriSteem not plan to market the new design?

Ms. Dodd:    Objection; outside the scope.
              You can answer.

A.    It doesn't affect any of our customers.  The operation -- doesn't affect the operation of the humidifier.  There is no change that would be visible to a customer.

Q.    Will there be changes to the installation and operations manual?

A.    Drawing updates.

Q.    Any other changes to the installation and operation manual?

A.    Nope. Just drawings.

(Dkt. 108-6, Pl.'s Ex. O at 31:14-32:23.)

Both witnesses answered the questions posed to them about the Modified GTS-LX Humidifiers. To the extent Plaintiff is concerned that those witnesses will offer testimony beyond their personal knowledge or that contradicts their deposition testimony, that is an issue to be addressed at trial. The Court denies Plaintiff's request as to Lanners and Hanson because both witnesses testified as to their knowledge of the Modified GTS-LX Humidifiers (to the extent they were asked and had any) and therefore there is no Rule 26(e) violation. Further, any alleged Rule 26(e) violation is harmless as Plaintiff had the opportunity to depose them, and in fact did depose them, about their knowledge of the Modified GTS-LX Humidifiers.

### d.    David Pflum

Lastly, Plaintiff claims that because Defendant's president, David Pflum, was "instructed" not to answer questions "about what other topics [he] planned to testify about at trial," and "claimed to not understand the questions he was permitted to answer[,]" Plaintiff did not "pursue" questions regarding the Modified GTS-LX Humidifiers and as a result, Pflum should not be permitted to testify about the Modified GTS-LX Humidifiers and the "opinions of counsel pertaining to invalidity of the asserted patent rendered by Patrick Johnson." (Dkt. 105 at 1-2; Dkt. 106 at 19-22.) Defendant

counters that counsel's objections precluding Pflum from answering questions he intended to testify about at trial was proper was in view of the attorney work product doctrine, that Plaintiff has not provided any authority to show otherwise, and that moreover, Plaintiff did not ask Pflum any specific questions about the Modified GTS-LX Humidifiers at his deposition and cannot therefore complain about failing to gain his knowledge about it.  (Dkt. 120 at 30-31.)

Plaintiff deposed Pflum on May 20, 2022, and he testified about his role and duties as Defendant's President, including that he is "involved in all aspects of managing the business." (*See* Dkt, 108-7, Pl.'s Ex. P at 6:16-10:2.)  Plaintiff did not ask Pflum any questions regarding the Modified GTS-LX Humidifiers, and instead asked him "what testimony, if any, [he] planned to give at trial in this dispute?" (*Id.* at 49:5-20.) Defendant's counsel objected on the basis of work product, instructed Mr. Pflum not to answer, and stated that Plaintiff's counsel could "ask him any facts about the case[.]" (*Id.*)  Plaintiff did not complain of this objection until now or seek to keep Pflum's deposition open.  (*See generally*, Dkt. 108-7, Pl.'s Ex. P.)  The Court declines to preclude Pflum from testifying on topics simply because he was not asked about them during his deposition, or because he did not recognize patent damages terms such as "convoy sales." (*See* Dkt. 106 at 19-20.)  Plaintiff has not argued that it was precluded from asking Mr. Pflum about the Modified GTS-LX Humidifiers or any other pertinent questions. Further, given that Pflum was identified as a witness who would testify at trial about "[t]he sales and profits of the accused products" and "Dri-Steem's business operations pertaining to the accused products," the Court finds any Rule 26(e) violation with respect

67

to the same subjects to the Modified GTS-LX Humidifiers is substantially harmless. Accordingly, the Court denies the Motion for Sanctions as to Pflum.

For all of these reasons, the Motion for Sanctions is denied in its entirety.

## IV.    JOINT SEALING MOTIONS

The Court turns to the Joint Sealing Motions.  The parties agree that Docket Entries 83-31, 83-36, 83-39, 107-1, 107-2, 107-5, and 107-6 should be unsealed.  (Dkt. 89 at 10-12; Dkt. 127 at 2-3.)  As such, these documents will be unsealed in accordance with the Local Rules.

The parties agree or otherwise do not object to the continued sealing of Docket Entries 73, 75-1, 75-2, 75-3, 75-4, 75-5, 75-6, 82, 83-1, 83-2, 83-3, 83-4, 83-5, 83-6, 83-7, 83-8, 83-9, 83-10, 83-11, 83-12, 83-13, 83-14, 83-15, 83-16, 83-17, 83-18, 83-19, 83-20, 83-21, 83-22, 83-23, 83-24, 83-25, 83-26, 83-27, 83-28, 83-29, 83-30, 83-32, 83-33, 83-34, 85-35, 83-37, 83-38, 83-40, 83-41, 99, 101-1, 101-2, 101-3, 101-4, 101-5, 101-6, 101-7, 101-8, 101-9, 101-10, 101-11, 114, 116-1, 116-2, 116-3, 116-4, 106, 107, 107-3, 107-4, 108, 108-1, 108-2, 108-3, 108-4, 108-5, 108-6, 108-7, 122-1, 122-2, 122-3, 122-4, 122-5, 122-6, and 122-7 on the basis that these documents contain confidential information regarding Plaintiff's and Defendant's businesses and product development processes, confidential settlement communication, testimonies describing confidential information, and expert report and other materials designated as "Confidential" or "Highly Confidential – AEO" pursuant to the Protective Order.  (Dkt. 89 at 2-13; Dkt. 126 at 2-5; Dkt. 127 at 2-6.)

Based on these representations and the Court's review of the documents, the Court concludes that the need to maintain the information in the above entries under seal outweighs the public's right of access. *See* Fed, R. Civ P. 5.1; L. R. D. Minn. 5.6(d) *advisory committee's note*; *IDT Corp. v. eBay*, 709 F.3d 1220, 1224 (8th Cir. 2013). However, given that these documents were filed in conjunction with non-dispositive motions, the Court emphasizes that this decision is not determinative as to whether this information will remain sealed in the future to the extent that it is filed and considered by the Court with respect to future dispositive motions. *See In re Baycol Prod. Litig.*, No. 08-CV-5758 (MJD/ECW), 2021 WL 1893897, at *4 (D. Minn. May 11, 2021). To the extent that there is any future disagreement relating to whether a specific docket entry should remain unsealed, the Court expects the parties to conduct a robust meet and confer to attempt to resolve any dispute prior to filing any joint motion for continued sealing.

## V.    ORDER

For the reasons stated above, and based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Dri-Steem Corporation's Motion for Leave to Amend Invalidity Contentions (Dkt. 70) is **DENIED**.

2.    Plaintiff Condair Group AG's Motion for Rule 37(c) Sanctions (Dkt. 105) is **DENIED**.

3.    The Parties' Joint Motions for Continued Sealing (Dkts. 89, 126, and 127) are **GRANTED** as follows:

a.      Docket Entries 83-31, 83-36, 83-39, 107-1, 107-2, 107-5, and 107-6 will be **UNSEALED** in accordance with the Local Rules.

b.      Based on the parties' agreement and the Court's review, Docket Entries 73, 75-1, 75-2, 75-3, 75-4, 75-5, 75-6, 82, 83-1, 83-2, 83-3, 83-4, 83-5, 83-6, 83-7, 83-8, 83-9, 83-10, 83-11, 83-12, 83-13, 83-14, 83-15, 83-16, 83-17, 83-18, 83-19, 83-20, 83-21, 83-22, 83-23, 83-24, 83-25, 83-26, 83-27, 83-28, 83-29, 83-30, 83-32, 83-33, 83-34, 83-35, 83-37, 83-38, 83-40, 83-41, 99, 101-1, 101-2, 101-3, 101-4, 101-5, 101-6, 101-7, 101-8, 101-9, 101-10, 101-11, 114, 116-1, 116-2, 116-3, 116-4, 106, 107, 107-3, 107-4, 108, 108-1, 108-2, 108-3, 108-4, 108-5, 108-6, 108-7, 122-1, 122-2, 122-3, 122-4, 122-5, 122-6, and 122-7 will remain **SEALED**.

4.      This Order will be filed under temporary seal.  On or before **October 26, 2022**, the parties must file under seal their proposed redactions to this Order, or if they cannot agree, their respective proposed redactions, following which the Court will either permanently seal this Order and issue a redacted version, or order this Order unsealed in its entirety.  If the parties do not propose any redactions, the Court will order this Order unsealed in its entirety.


DATED: October 12, 2022                    _s/Elizabeth Cowan Wright_
                                           ELIZABETH COWAN WRIGHT
                                           United States Magistrate Judge